(C.D. 2171)

MISSION OF SAN GABRIEL
W. J. BYRNES & Co. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 26, 1960)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) as *amicus curiae.*

Before JOHNSON, DONLON, and RICHARDSON, Judges; JOHNSON, J., concurring

DONLON, Judge: The Mission of San Gabriel, of San Gabriel, Calif., imported, in 1958, five wooden boxes, the contents of which were entered as stained glass for a house of worship. The importer claims that this glass is exempt from duty under paragraph 1810 of the Tariff Act of 1930. The official papers were not offered in evidence at the trial, but the record makes clear the nature of the controversy.

The collector at Los Angeles, in compliance with a published Customs Bureau directive (C.I.E. 1763/57, September 11, 1957), of which we may take judicial notice, rejected the claim for duty free entry on the ground that panels, made from pieces of colored glass set in cement, and not leaded together, are dutiable under paragraph 218(f), and not duty free under paragraph 1810. However, if they were leaded, the directive stated that the glass might be free under paragraph 1810. Since these panels were cemented, not leaded, duty was assessed at the modified paragraph 218(f) rate of 30 per centum ad valorem.

Plaintiffs protested, and now seek our judgment directing refund of the duty exacted by the collector. In its protest, the Mission makes two claims that are additional to the entry claim of paragraph 1810 exemption. The stained glass of this importation is now also claimed to be duty free, alternatively, under paragraph 1774 or under paragraph 1809. We defer our consideration of these alternative claims until we have disposed of the paragraph 1810 claim.

Paragraph 218(f), as modified by the General Agreement on Tariffs and Trade (T.D. 51802), the provision of the collector's classification, provides as follows:

Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner * * *:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other _____ 50¢ on each article or utensil, but not less than 30% nor more than 50% ad val.

Paragraph 1810 grants exemption from duty for—

Works of art * * * including stained or painted window glass or stained or painted glass windows which are works of art when imported to be used in houses of worship, valued at $15 or more per square foot * * *; but such exemption shall be subject to such regulations as the Secretary of the Treasury may prescribe.

It has been stipulated by counsel that the imported glass of this suit was valued at over $15 per square foot. It has also been stipulated that there was compliance with the regulations of the Secretary of the Treasury. It has not been stipulated either that the glass was imported to be used in a house of worship or that it is a work of art.

There is evidence that the imported glass was created in Chartres, France, by a well-known artist in the medium of stained glass, especially for the Chapel of the Annunciation in the Mission of San Gabriel, and that, on importation, the glass was installed in that chapel. There are no proofs to the contrary. We hold that this glass was imported to be used in a house of worship.

The controversy, so far as it has to do with paragraph 1810, revolves chiefly around the issue whether the glass of this importation is, in fact, stained window glass in the tariff sense. If we hold that it is, there will remain the subsidiary issue, under paragraph 1810, as to whether it is stained window glass which is a work of art.

Defendant's brief challenges plaintiffs' proofs that the glass from which the window glass was made, was colored in a manner recognized as staining. (Defendant's brief, page 4.) Defendant adduced no proofs on trial. Plaintiffs did. One of plaintiffs' witnesses was the architect of the chapel for which the window was created and in which it was installed, Mr. Earl Trudeau. Mr. Trudeau, testifying as to successive steps in the creation of this window for the chapel, said that the Chartres artist, Mr. Loire, selected glass and put "those selections of colored, stained glass over the design * * *." (R. 15.) There is repeated reference to the use of stained glass. Questioned more specifically, the witness said that the glass was not painted, but that the *stain* was put into the glass at the time when the glass was manufactured, and that it is part of the material out of which the window was created. (R. 24.)

We find no support in the record for defendant's contention that the glass from which the imported panels were created is not what is known as stained glass.

On the evidence of record, the merchandise of this importation was not imported as a window, but consisted, at the time of importation, of five cases of panels, in upwards of 30 sections, made from *stained glass*.

In C.I.E. 651/58, April 29, 1958, W. E. Higman, Chief, Division of Classification and Drawbacks in the Customs Bureau, reaffirmed the prior C.I.E. ruling of September 11, 1957, *supra*, in a letter which he addressed to Mr. J. Earl Trudeau. While the street address of Mr. Trudeau, as stated in the chief's letter, is First and Bay Streets, Alhambra, Calif., and the witness Trudeau on the stand gave his address as 40 West Bay Street, Alhambra, Calif., there is reasonable ground to suppose that the Mr. Trudeau who was the addressee of the chief's letter and the Mr. Trudeau who was architect of the Mission Chapel, and who testified at the trial, are one and the same person. There is also ground to suppose that the "imported panels of thick, chipped, colored glass joined together by cement," subject of the chief's letter to Mr. Trudeau, published in C.I.E. 651/58, *supra*, are the glass panels of this litigation.

Plaintiffs offered the testimony of four witnesses and also introduced into evidence certain exhibits. Defendant adduced no evidence. Both parties filed briefs. We have had also the assistance of a brief that was filed by *amicus curiae* in support of defendant's contention.

Except for defendant's argument that the glass ingredient of the imported panels was not stained glass, as to which we have ruled against defendant on the evidence of record before us, the gist of defendant's position appears to be that, when pieces of stained glass an inch thick are bound by cement, they cannot be stained window glass in the tariff sense, but that such glass may be stained window glass, for tariff purposes, if lead is the binder used.

The testimony of plaintiffs' witnesses describes how these panels were made and also points out the differences between the method of their creation and that of stained window glass of the conventional type.

In both, the artist creates the design, and selects flat glass in the colors and size of pieces he desires in order to develop his design. In both, the selected glass pieces are laid over the design. In the conventional type of window, the glass pieces used are usually about a quarter inch thick. In this window, the glass pieces used were an inch thick.

In a conventional window, the glass pieces are not chipped. They remain as flat pieces of stained glass. In this window, the flat pieces of stained glass were chipped. The process of chipping is described in detail in the record. This is a phase of the artistic development of the window, since the facets "bring through more light just as facets of a diamond enhance the stone." (R. 15.)

In the conventional window, the thin flat glass pieces are usually soldered together with metal strips known as lead cames. In this window, the glass pieces were united by cement, poured so as to preserve the artistic effect of the faceting.

There is no evidence that thin steel webbing is used in the stained glass itself, to add structural strength to conventional windows. There is evidence that steel webbing is used within the glass in some inch-thick windows.

There is evidence that when inch-thick glass is used and the window surface is large, union of the glass pieces with lead cames will not produce a weathertight window, whereas, in such cases, the use of cement to bind the glass pieces makes the window both structurally strong and weathertight, without lessening the artistic values of the window.

There is evidence that inch-thick stained glass, in selected colors, grouped to compose an artistic design, faceted to bring through more light, and united with cement, is a recognized art form among stained glass window artists.

We are to ascertain what Congress intended when it enacted paragraph 1810, and to apply that intention to the facts of record here.

At the outset, it should be noted that there is *eo nomine* provision in paragraph 1810 both for stained window glass and for stained glass windows. In the dutiable provision, paragraph 230, which is not before us, the *eo nomine* provision is for stained glass windows "and parts thereof, not specially provided for."

What stained glass windows are not specially provided for, within the provision of paragraph 230, seems clear. They are those stained glass windows which are works of art, which are imported to be used in houses of worship, which are valued at $15 or more per square foot, and as to which there has been compliance with the regulations of the Secretary of the Treasury. Such windows are specially provided for in paragraph 1810.

What "parts" of stained glass windows are specially provided for, other than in paragraph 230? There is no other specific provision for *parts* of stained glass windows. The provision in paragraph 1810 is for stained glass windows, or for *stained window glass*. If effect is given to both paragraph 230 and paragraph 1810, as enacted by Congress, and we are not to ignore either, it seems clear that stained window glass, not imported as a window, but which is a work of art, which is imported to be used in a house of worship, which is valued at $15 or more per square foot, and as to which there has been compliance with the regulations of the Secretary of the Treasury, is stained window glass which is specially provided for under paragraph 1810, within the meaning of the not specially provided for parts provision of paragraph 230.

In construing what was the intention of Congress, it is useful to refer to the Summary of Tariff Information, which was before Congress at the time when it was acting on the bill which became the law

that is to be construed. In this case, it is the Tariff Act of 1930. Schedule 2 of the summary (1929) on the Tariff Act of 1922, is entitled "Earths, Earthenware, and Glassware." It was before Congress when the 1930 law was enacted. On pages 557 and 558 of schedule 2, there is summarized material with respect to stained and painted glass windows and parts thereof.

In his letter to the architect, Mr. Trudeau, referred to, *supra*, Chief Higman extracted five words from this 1929 summary, and cited those five words as support for his conclusion that, in enacting the free provision for stained glass windows in the 1930 act, Congress had in mind "the conventional church windows of flat stained glass in which the individual pieces of stained glass are joined together with lead." The excerpted words, cited by Chief Higman in his letter, are "windows of colored, leaded glass."

A more complete citation of the tariff summary material throws a somewhat different light on the data before Congress, and illuminates some of the pitfalls in the chief's selective citation. The 1929 summary presented to Congress a considerable amount of material on the production both of stained window glass and of stained glass windows. Much of that material seems to us helpful in resolving the issue now before us. The tariff summary states (pp. 557, 558) as follows:

**Description and uses.**—Windows in colored leaded glass have long been known popularly and technically as "stained glass windows," *but the term is not accurate.* Colorings in glass windows may be produced (1) by melting a glass batch containing metallic oxides; (2) by flashing—that is, melting a thin layer of colored glass onto a sheet of colorless glass; (3) by painting ceramic enamels, glosses, colors, and oxides on the glass which is then fired to effect enameling, staining, or coloring; (4) by painting with liquid gold and firing the pieces to fit the gilding; (5) by painting the glass with ordinary oil paint. Glass windows and designs are *usually* composed of smaller pieces of glass colored in any of the ways above mentioned and held together by soldered lead strips. Sometimes pictorial effects are obtained by painting on single pieces of glass.

**Production.**—Raw materials used in the production of stained and painted glass windows are antique, flashed, stained, colored, and decorated glass sheets; fluxes, enamels, pressed lead, cement, and steel framing. There are about 900 small shops dealing in stained and painted glass windows equipped to stain and burn glass. Besides these there are a number of concerns that cut and assemble windows only. The production of assembled windows and parts in this country consists mainly of original art work.

Cutting is a purely mechanical process, whereas selecting stainings and painting requires a knowledge of the properties of colors and are usually done by highly-trained technicians and artists. Glazing is the process of assembling the pieces of glass, which have been separately through the other processes, and binding them together with strips of metal, the ends of which are soldered. The principal concerns engaged in painting, staining, and assembling decorative glass windows are located in New York, Chicago, Pittsburgh, and northern New Jersey. Production is estimated at about seven and one-half million dollars a year.

Imports.—There is very little importation of completely assembled stained-glass windows. Imports consist largely of colored glass and parts of windows in form for assembling and erecting, which come principally from Germany. [Emphasis supplied.]

The 1929 summary does not repeat, under paragraph 1810, the material that has been quoted here with respect to the production of stained glass and stained glass windows. Under paragraph 1810, consideration in the summary has to do chiefly with the requirement that stained window glass and stained glass windows shall be works of art in order to be entitled to free entry.

The material before Congress, as to lead cames, is not quite so comprehensive as defendant appears to think. The description relied upon by Chief Higman is said in the summary itself (and in the same sentence) not to be "accurate." Congress was made aware, in the tariff summary, that glass windows and designs are *usually* composed of small pieces of stained glass which are held together by soldered lead strips; but the very statement that this is *usual* indicates that it was recognized that something else also was possible. What is usually done, to be sure, is what can most often be expected; but it is not, by definition, the exclusive method of doing the thing. Indeed, in detailing those raw materials, besides the glass, that are used in the production of stained glass windows, *cement*, the binder that was here used, is a material enumerated in the 1929 tariff summary.

Defendant appears to argue that the effect of paragraph 1810 is identical with what it would have been if Congress had inserted the limiting words "with lead cames" or "leaded" as part of the *eo nomine* provision for stained window glass and stained glass windows. Congress did not do this. Granted Congress understood that lead cames were then the "usual" binder in stained window glass and stained glass windows, there is nothing to suggest an intention on the part of Congress to exclude from paragraph 1810 (or paragraph 230, as the case may be) window glass or glass windows made, in fact, from stained glass and in which some other material than lead was used as the structural and artistic binder, or that Congress intended that nonleaded windows of stained glass should be classified under the same provision as glass table and kitchen articles and utensils.

It is a well-accepted principle of the construction of tariff laws that Congress looks to the future. "It must be remembered that tariff acts are intended to bring within the purview of their provisions imported merchandise which is described therein, notwithstanding the fact that such merchandise, at the time of the law's enactment, was not known in our international commerce. It is well established that tariff statutes are made for the future as well as for the present." *United States* v. *L. A. Salomon & Bro.*, 22 C.C.P.A. (Customs) 490, at page 495.

Citing *Newman* v. *Arthur*, 109 U.S. 132, our appeals court, in the *Salomon* case, quoted the United States Supreme Court as follows:

The fact that at the date of the passage of the act goods of the kind in question had not been manufactured, cannot withdraw them from the class to which they belong, as described in the statute, where, as in the present case, the language fairly and clearly includes them.

The provision in paragraph 1810 is for stained window glass and stained glass windows. Glass, such as Congress understood to be stained glass, was used to make these glass window panels. Congress understood that lead cames were the *usual* binder in a stained glass window, but it did not limit the *eo nomine* provision to stained window glass and stained glass windows that are leaded.

It provided for all stained glass windows, either in paragraph 230 or in paragraph 1810. Congress had before it data showing that cement might be a raw material used.

We hold that the stained window glass of this importation is within the *eo nomine* provision of paragraph 1810, if it is a work of art.

The evidence of record adduced by plaintiffs, and not contradicted by evidence adduced by defendant, is that this window is a work of art.

The California architect who collaborated with the French artist in glass, Gabriel Loire, of Chartres, testified. He told of the creation of the design. He established Gabriel Loire as one of the foremost artists now working in the medium of stained glass. He and other witnesses described the window, its concept, and design. There is opinion testimony of experts who have viewed the window, that it is a work of art. There are also in evidence two photographs of the window (exhibits 1 and 2). While in themselves these photographs do not establish the artistic quality of the window, they tend to corroborate the opinion evidence of witnesses who testified.

Indeed, defendant makes no substantial argument that this window glass is not a work of art, resting its case rather on the ground (which we have already decided) that it is not the kind of stained window glass which Congress intended to include in paragraph 1810.

As to plaintiffs' alternative claims, there is precedent for ruling that a stained glass window is not a mosaic. A mosaic is a "*surface decoration* made by inlaying in patterns small pieces of variously colored glass, stone, or other material." [emphasis supplied], Webster's New International Dictionary, second edition (1956); *United States* v. *Columbo Co.*, 21 C.C.P.A. (Customs) 177. In *Frei Art Glass Co.* v. *United States*, 15 Ct. Cust. Appls. 132, the provision for stained window glass was held not to include mosaics.

Plaintiffs have not pressed their claim under paragraph 1809.

The claims under paragraphs 1774 and 1809 are overruled. The claim under paragraph 1810 is sustained. Judgment will be entered accordingly.

CONCURRING OPINION

JOHNSON, Judge: The importation involved in this case is a colored glass window entitled "The Annunciation," imported in sections, and assessed with duty under paragraph 218(f) of the Tariff Act of 1930, as modified, as an article of colored glass. It is claimed to be entitled to free entry under paragraph 1810 of said tariff act as a stained glass window which is a work of art, imported to be used in a house of worship, or, in the alternative, free of duty under paragraph 1774, as amended, as a mosaic imported for use of a corporation organized and operated for religious purposes.

It is clear that the alternative claim is untenable since the imported article is not a mosaic, which is defined as "a surface decoration made by inlaying in patterns small pieces of variously colored glass, stone, or other material" (Webster's New International Dictionary) or as "a kind of tessellated or inlaid work composed of bits, squares, or cubes of stone, glass, enamel, etc., combined so as to form an artistic pattern for wall-decoration or pavements" (Funk and Wagnalls New Standard Dictionary).

In order to come within the applicable exemption in paragraph 1810, it is necessary that the article consist of a stained or painted glass window; that it be a work of art; that it be imported to be used in a house of worship; that it be valued at $15 or more per square foot; and that the regulations be complied with.

In the instant case, the only points at issue are whether the window is a work of art and whether it is a stained or painted glass window within the meaning of the tariff act.

On the first point, evidence has been presented by the plaintiffs to the effect that this window was designed and made by Gabriel Loire, who was described as one of the foremost designers of stained glass in the world today, and that said window is a work of art. While the record might not be sufficient on this point had any evidence to the contrary been introduced by the Government, in the absence thereof, I concur in the holding of my colleagues that this is a work of art.

The next question, whether it is a stained glass window within the meaning of the tariff act, involves more difficulty and requires more detailed consideration.

According to the record presented, this merchandise was made of chipped or faceted glass, about 1 inch thick. The method of manufacture was described by the witness Trudeau as follows: After the designer had selected the pieces of stained glass to be used and placed them over the design, the pieces were chipped and faceted to bring a

uniform brilliance over the surface. Then, cement was poured in between the pieces of glass to hold them together. After the cement had set and the artist had viewed the work, the glass was chipped around and across the circumference to bring out the artistry of the method. The manner of chipping was described by the witness as follows:

Well, in the first breaks [sic] the slab of glass is set over a piece of steel angle and a regular chisel of a mallet form, sharp on one edge and blunt on the other, is struck across the glass, breaking the glass over the angle of steel laying [sic] on the bench. That's the first phase. Then the final phase of chipping is done by an actual chisel driven across the surface of the glass when the cement is holding it rigidly in place.

Mr. Trudeau stated that faceting does what others try to do by painting; that it is a way of painting by chipping off the surface of the glass to bring out and accent form and content; that it allows the light to penetrate the slab glass; that an equal amount of light is transmitted through the window as is reflected off due to the faceting; that the amount of light which comes through depends upon the extent of the chipping.

The witness Jung testified that chipped glass gives an entirely different effect. He said:

* * * You get a scintillating quality through the chipping, the faceting. You are not getting—in other words, you do with the chipped glass what you do with matting on the thin glass. It's a question of controlling the light.

According to Mr. Trudeau, the ordinary type of stained glass window is composed of flat glass, usually not exceeding a quarter of an inch in thickness. It is laid upon the design in the same manner as that followed by Mr. Loire but the pieces are joined by lead cames, "H-shaped strips of lead that have the eighth to quarter inch flat glass inserted to the lip on either side. The lip is withdrawn after the panel is completed and that came is packed with cement to grip the glass and give a sound waterproof surfacing."

The witness stated that lead cames could be used in joining pieces of chipped glass, but it was an unsatisfactory method because of the irregular surface of the glass. In some cases where chipped glass had been joined by lead cames, the windows leaked badly.

Stained glass has been provided for in tariff acts since 1846, and stained glass windows have been provided for *eo nomine* since 1890. The latter have been understood to be windows composed of pieces of stained or painted glass fastened together by strips of lead. *United States* v. *Perry*, 146 U.S. 71 (1892) ; *Perry, Ryer & Co.* v. *United States*, 6 Ct. Cust. Appls. 201, T.D. 35462 (1915) ; *American Express Co.* v. *United States*, 30 Treas. Dec. 248, T.D. 36165 (1916) ; Dictionary of Tariff Information (1924), page 376 ; Summary of Tariff Information, 1929, page 557 ; *George D. Spiers, Doing Business as The Payne-Spiers Studios* v. *United States (George L. Payne, Party in Interest)*,

43 Cust. Ct. 149, C.D. 2119 (S. 5019). Windows of this type have long been known, and, according to some authorities, attained the height of their artistic perfection in the 12th, 13th, and 14th centuries. Encyclopaedia Britannica, volume 21, page 291; Collier's Encyclopedia, volume 18, page 168; Encyclopedia Americana, volume 25, page 471; The Columbia Encyclopedia, page 1879; Encyclopedia of the Arts, Runes and Schrickel, page 966.

The window before us is of a different type in that it is composed of pieces of chipped or faceted glass joined together by cement, instead of lead. According to the record, chipped or faceted glass has been used in windows for no more than 10 years. Thus, this type of window was not known at and prior to the date of the enactment of the Tariff Act of 1930.

The general rule is that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of the enactment. of the act. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C.C.P.A. (Customs) 472, T.D. 44762; *W. J. Lake & Co., Inc., et al.* v. *United States*, 27 C.C.P.A. (Customs) 247, C.A.D. 94. However, tariff acts are made for the future, and it has been held that a statutory term will reach out and embrace subsequent merchandise, the existence of which was not known prior to the effective date of the tariff act. *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T.D. 43294; *Chicago Mica Co. et al.* v. *United States*, 21 C.C.P.A. (Customs) 401, T.D. 46927. "As to all such articles the statute will be held to apply if the articles possess an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification." *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, T.D. 40520.

In a recent case, *Davies Turner & Co.* v. *United States*, 45 C.C.P.A. (Customs) 39, C.A.D. 669, it was stated (p. 41):

* * * The meaning of *eo nomine* provisions is to be determined as of the date of enactment but, when so determined, that meaning will embrace all subsequently created articles which fall within it. Tariff acts, therefore, are made for the future in the sense that they embrace articles not in existence at the time of enactment, but the meaning of words used in such acts is fixed at the time of enactment and does not fluctuate as the meaning of words might subsequently vary.

The question then is whether or not the new merchandise possesses sufficient resemblance to the old as to fall within the common meaning of the term as that term was construed at the date of the enactment of the act.

In *United States* v. *Burroughs-Wellcome Co., Inc.*, 43 C.C.P.A. (Customs) 142, C.A.D. 621, it was held that the dried leaf of the plant *Digitalis lanata* was not "digitalis" within the meaning of the tariff act, on the ground that it was not recognized as digitalis by any of the

authorities; that it did not have the same composition as *Digitalis purpurea*; that, while it was similar in some respects, it was not substitutable for *Digitalis purpurea*; and that it was not described or prescribed as digitalis. The court stated, in the course of its opinion (p. 144):

> \* \* \* Certainly, if parts of plants other than *Digitalis purpurea* were discovered having the same composition as the "digitalis" from *Digitalis purpurea*, and were recognized as being completely substitutable therefor, and referred to as "digitalis" in the trade, then such new products would be properly classified as "digitalis" for tariff purposes. [Italics quoted.]

In *Davies Turner & Co* v. *United States, supra*, it appeared that, at the time of the enactment of the Tariff Act of 1930, bentwood furniture had been made by a process which involved subjecting solid pieces of wood to steam or boiling water, thus making them pliable so they could be bent. Subsequently, two other processes were invented: One, known as "ribboning," involved making a number of parallel saw cuts in the wood to be bent, inserting strips of wood combined with glue in the cuts, bending the wood by hand or air pressure, and clamping it in a form until the glue was set; the other, known as "laminating," involved laminating under pressure and bending strips of wood, glued on both sides. The court held that Congress, in employing the term bentwood, must have intended to restrict the meaning of that term to the type of furniture known by that name at the time of the enactment of the act, rather than to broaden it to include all types of furniture which contained wood that was literally bent.

In another recent case, *Sears, Roebuck and Co.* v. *United States*, 46 C.C.P.A. (Customs) 79, C.A.D. 701, the court held that so-called food umbrellas, used to protect food from insects, were not classifiable as "umbrellas." The court referred to a dictionary definition which included "Anything serving to screen, shelter, or protect," "An umbrella-shaped structure or device" and stated:

> The above-mentioned definition relied upon by appellant was added to Webster's International Dictionary subsequent to the enactment of the Tariff Act of 1930. That definition may not, in accordance with the cases cited above, be utilized to expand the meaning of "umbrellas" at the date of enactment of the 1930 Act, but solely to clarify the meaning at that time.
>
> The definitions which were in existence at the time of the passage of the Tariff Act of 1930, indicate that umbrellas were considered solely objects of characteristic structure *used* "as a protection against the sun or rain \* \* \*."

The window in the instant case was made by a somewhat different method and with some different materials than is a conventional stained glass window. Obviously, the most important material in a stained glass window is the stained glass. The glass used in this window was stained in the course of its manufacture. Thereafter, it was chipped and faceted, but, as far as this record shows, it still retained its character as stained glass.

In C.I.E. 1763/57 (September 11, 1957) and in C.I.E. 651/58 (April 29, 1958), the Chief of the Division of Classification and Drawbacks instructed customs officers that panels or windows made from pieces of colored glass set in cement were not entitled to free entry under paragraph 1810, but that windows made of pieces of 1-inch thick colored glass, joined together by lead, having the requisite value and artistic merit, were classifiable under said paragraph. While it may be, as stated in certain encyclopedias,[1] that the lead *per se* is more than a connecting medium but plays a part of its own in the design, this has not been brought out in the record presented. Nor does the record establish that this type of window has any great difference in artistic effect or use from windows commonly known as stained glass windows.

The witness Trudeau called this type of window a mosaic of stained glass and Father Aggeler referred to it as faceted stained glass. The witness Jung testified:

Well, some people in the business call it a faceted stained glass window, some call it a chipped stained glass window, some call it a slab glass window, * * *. I would call it a faceted slab glass, faceted stained—faceted slab stained glass window.

While recognizing the fact that this window differs in certain particulars from conventional stained glass windows, I am of opinion that the record, as presented, establishes *prima facie* that this window possesses the essential resemblance to conventional stained glass windows and is designated as a type of stained glass window by those dealing with such articles. I, therefore, concur in the holding that this window is entitled to free entry under paragraph 1810 of the Tariff Act of 1930 as a stained glass window having the requisite value, artistic merit, and use.

(C.D. 2172)

| | | |
|---|---|---|
| The Golding-Keene Company<br>The Feldspar Corporation | *v.* | United States (E. Dillingham, Inc., a/c<br>Rheem Mfg. Co., Party in Interest) |

---

[1] Encyclopaedia Britannica, vol. 21, p. 291; Collier's Encyclopedia, vol. 18, p. 168; The Columbia Encyclopedia, p. 1879.