SMILLIE & Co. *v.* UNITED STATES (No. 2428).[1]

1. EVIDENCE, QUALIFICATION OF WITNESS—COMMERCIAL DESIGNATION.

It is the settled rule that commercial designation must be shown to be definite, uniform, and general; not partial, local, or personal. A witness who does not qualify as to his knowledge of such matters is not competent to testify as to commercial designation.

2. CONSTRUCTION, PARAGRAPH 518, TARIFF ACT OF 1913—"FERROMANGANESE"— COMMERCIAL DESIGNATION.

The meaning to be given the term "Ferromanganese," in paragraph 518, tariff act of 1913, is the commercial meaning which the term had at the time of the passage of the act.

3. FERROMANGANESE—FERRO-SILICO MAGANESE.

Merchandise claimed by importers to be ferromanganese under paragraph 518, tariff act of 1913, and by the Government to be ferro-silico manganese, was classified by the collector as a miscellaneous alloy used in the manufacture of steel, under paragraph 102. Upon proof by the Government that, at and prior to the passage of the act, the commercial meaning of the term ferromanganese necessitated a higher carbon and a lower silicon content than that of the merchandise at bar, the overruling of the protest is affirmed.

United States Court of Customs Appeals, November 22, 1924

APPEAL from Board of United States General Appraisers, G. A. 8810 (T. D. 40223)

[Affirmed.]

*B. A. Levett* for appellants.

*William W. Hoppin*, Assistant Attorney General (*Samuel M. Richardson*, special attorney, of counsel), for the United States.

[Oral argument October 22, 1924, by Mr. Levett and Mr. Richardson]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The material imported in this case was imported during the year 1920, and is claimed by the importers to be ferromanganese, and to be free of duty under paragraph 518, tariff act of 1913, which is as follows:

518. Iron ore, including manganiferous iron ore, and the dross or residuum from burnt pyrites; iron in pigs, iron kentledge, spiegeleisen, wrought iron and scrap and scrap steel; but nothing shall be deemed scrap iron or scrap steel except second-hand or waste or refuse iron or steel fit only to be remanufactured; ferromanganese; iron in slabs, blooms, loops or other forms less finished than iron bars, and more advanced than pig iron, except castings, not specially provided for in this section.

The collector assessed the same for duty as an alloy used in the manufacture of steel at 15 per cent ad valorem under paragraph 102 of the same act, which paragraph is as follows:

102. Chrome or chromium metal, ferrochrome or ferrochromium, ferromolybdenum, ferrophosphorus, ferrotitanium, ferrotungsten, ferrovanadium, molybde-

[1] T. D. 40520.

num, titanium, tantalum, tungsten or wolfram metal, and ferrosilicon, and other alloys used in the manufacture of steel, not specially provided for in this section, 15 per centum ad valorem.

The importers protested and appealed to the Board of General Appraisers, where the protest of the importers was overruled, the decision of the collector affirmed, and judgment rendered accordingly. From that judgment the importers appeal. The only question properly arising here is whether the importation can be properly classified as ferromanganese as claimed by the importers.

Two separate analyses were made of the material in question, which analyses are not controverted, and which show the material to contain the following constituents:

|  | First lot | Second lot |
|---|---|---|
|  | *Per cent* | *Per cent* |
| Manganese | 76.54 | 75.55 |
| Silicon | 10.09 | 9.17 |
| Phosphorus | .145 | .109 |
| Carbon | 3.71 | 4.05 |
| Iron | 8.09 | 7.50 |

The claim of the importers is that the imported material is a form of ferromanganese, and that although it does not measure up to the standard, or what was commercially known as ferromanganese on October 3, 1913, the date of the passage of the tariff act of 1913, by a subsequent lowering of the standards due to the World War, the material in question ought to be classed now as ferromanganese. The Government contends that there was, at the time of the passage of the tariff act of 1913, a definite, uniform, and general trade and commercial understanding of the term "ferromanganese," and that whatever change or lowering of standards may have occurred as the result of the World War, the substance now imported was not prior to the act of 1913, and is not now commercially known and designated as ferromanganese, but was and is ferrosilico manganese.

The importers produced five witnesses before the Board of General Appraisers in support of their contentions. Various questions were asked these witnesses and, on objections being sustained to these questions, exceptions were saved and a refusal to permit such questions to be answered is now assigned for error here. We have examined the record with some care as to the various rulings excepted to, and do not find that the board erred in its rulings. The appellants were attempting to prove that their importation came within the commercial designation of ferromanganese. The settled rule is that commercial designation must be shown to be definite, uniform, and general, and not partial, local, or personal.—United States v. Burlington Venetian Blind Co. (3 Ct. Cust. Appls. 378 [381], T. D. 32967); Sonn v. Magone (159 U. S. 417). We do not think any of the witnesses produced by the importers qualified themselves sufficiently within this rule to testify as to commercial designation.

The meaning to be given the term ferromanganese in the tariff act of 1913 is the commercial meaning which the term had at the time of the passage of that act. In United States *v.* Roessler & Hasslacher Chemical Co. (79 Fed. 313 [315]), the following language was used:

When words used in a tariff act have some peculiar trade meaning, it must, of course, be assumed that Congress used them with the meaning they had when they were inserted in the act, not with some new meaning acquired afterwards; and therefore in such cases the only competent testimony is such as tends to prove what that meaning was when Congress used the words.

Again, in Wm. J. Matheson & Co. (Ltd.) *v.* United States (90 Fed. 276 [278]), it is said:

Finally counsel for the United States claims that a commercial designation must be one existing and recognized in trade and commerce at and prior to the date of the tariff act in which such designation occurred. That this rule is well settled appears from the cases cited.

To the same effect is Dennison Manufacturing Co. *v.* United States (72 Fed. 258), and Ross *v.* Fuller (17 Fed. 224 [226]).

This rule, of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. As to all such articles the statute will be held to apply if the articles possess an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.—Klipstein *v.* United States (4 Ct. Cust. Appls. 510 [514]; T. D. 33936). But here no such question arises. The Government produced on the hearing before the Board of General Appraisers two witnesses, both of whom were qualified experts and who testified without objection on the part of the importers that the term ferromanganese had a definite, uniform, and general meaning and understanding in the trade at the time of the passage of the tariff act of 1913, and that, under that definite trade understanding and designation of the term, the material, the subject of importation here, was not, and never could have been, considered as ferromanganese. Their testimony showed that ferromanganese was a material used to eliminate oxygen in the making of steel and that while the amount of manganese in this substance varied during the World War, from a pre-war standard of approximately 80 per cent to a low point of 70 per cent, no material of the kind could be considered ferromanganese which contained above 1 per cent of silicon, and that the carbon in standard ferromanganese would uniformly range from 5 to 7 per cent; the gist of this testimony being that ferromanganese, although the content of manganese might vary, must always have a high carbon and a very low silicon content; that there has never been any change in this respect either before or since the passage of the act. This testimony stands uncontroverted in the record.

It thus appears that at the time of the passage of the act of 1913, the term ferromanganese had a definite and well settled meaning, and that there has been no change in the commercial understanding as to this term since the passage of that act.

Appellants cite Goldschmidt-Thermit Co. *v*. United States (3 Ct. Cust. Appls. 187; T. D. 32467), in support of their contentions in this case. In that case the importer claimed the article to be ferromanganese, while the Government maintained that the material was metal unwrought and dutiable at 20 per cent ad valorem. The question of silicon content did not arise, but the court recognized that an alloy consisting of about 80 per cent of manganese, with a high content of carbon, approximately 5 per cent, and the balance iron, constituted as a matter of fact standard ferromanganese as known by the trade.

We are of opinion, under the evidence, that the material imported in this case was not ferromanganese, but was properly assessed for duty by the collector, and the judgment of the Board of General Appraisers is therefore *affirmed*.