(C.D. 3892)

JOMAC-NORTH, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 6, 1969)

*Allerton deC. Tompkins* for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Thomas A. S. Fernandes* and *Andrew P. Vance,* trial attorneys), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: The merchandise covered by this protest is described on the invoice as "Radyne plastic sheet welding equipment * * *" which was classified as an article having as an essential feature an electrical element or device under the provisions of paragraph 353, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and assessed with duty at the rate of 13¾ per centum ad valorem.

Plaintiff claims such merchandise to be properly subject to duty at the rate of 10½ per centum ad valorem under paragraph 353, Tariff Act of 1930, as modified by the Sixth Protocol of Supple-

mentary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108. Said provision insofar as is claimed herein provides for welding apparatus, instruments and devices.

The pertinent portions of the provisions involved herein read as follows:

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739:

> Articles having as an essential feature an electrical element or device, * * *:
>
> \*        \*        \*        \*        \*        \*        \*
>
> Other (* * *)_____ 13¾% ad val.

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 54108:

> Electrical signaling, welding, and ignition apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for_____ 10½% ad val.

The record consists of the testimony of two witnesses called on behalf of plaintiff and one on behalf of defendant as well as two exhibits offered by plaintiff. Plaintiff's exhibit 1 is an illustration of the imported merchandise. Plaintiff's illustrative exhibit 2 is a sample of plastic material upon which a seam has been made by the involved machines. The first witness, Mr. George L. Wheeler, the purchasing agent of plaintiff corporation testified that the involved machines were purchased by his company and sold by his company as electronic seam welders; that they are used to weld seams of industrial rainwear. The witness then produced an illustration of the machine and a sample of a plastic material which had been seamed by the machine. The machine is 49½ inches high, 20 inches wide, 26½ inches deep and weighs 295 pounds. The sewing of plaintiff's illustrative exhibit 2 was only used to set the seam before the imported machine was used.

Mr. Russell Edwards next called on behalf of plaintiff testified he is general production manager for the Roller Division of plaintiff corporation; that his duties include the maintenance of equipment, building and specifications for functioning equipment. The witness in his former employment did spot welding on metal cabinets. He has operated, repaired and rebuilt machines of the type involved herein. The witness described the operation of the machine as follows:

> A.    The cloth itself is placed on the anvil or platform, as shown on the illustration, the pedal bar is depressed, which activates a shift up the back of the machine, which lowers the upper contact bar. This activates an air cylinder, which applies pressure to this contact bar, at the same time activating a switch, electrical, which starts the pulses of electricity through the material itself. This generates heat, and causes a weld within the material.

Q. What causes the heat?—A. The resistance of the poly-vinyl chloride material to the electrical energy.

The witness further testified that spot welding of metal is very similar utilizing basically the same principles. In spot welding pressure is applied to two points while electrical energy is transmitted through the metal. The resistance of the metal causes heat which in turn causes the weld.

Mr. Edwards then stated the machines involved are used for plant production and are not to his knowledge used in laboratories.

On cross-examination the witness clarified the operation of the involved machine by stating that the electrical pulses transmitted by the involved machine were high frequency radio pulses of 37 megacycles. The electricity used in spot welding is alternating current. On questioning by the court, Mr. Edwards testified the plastic is "Welded" by being melted together but the material does not reach a molten state. The term welding has been applied to the involved merchandise for approximately four years although merchandise of this type had been in existence for a relatively long time prior thereto.

Mr. Robert D. Farkas appeared pursuant to a subpoena on behalf of defendant. Mr. Farkas is chief engineer of Guild Electronics and Plastic Corporation whose business is the manufacture of dielectric heat sealing machines. The witness testified that dielectric heat sealing machines utilize radio frequency energy to create a heat seal. Metal welding is the fusing of two metals by use of external heat such as gas torch. Metal bonding according to Mr. Farkas is identical to welding except a bonding agent is employed, such as solder.

Mr. Farkas stated that there are many types of welding. Some forms are: gas welding which utilizes gas to obtain heat; electric welding which utilizes electricity to obtain heat; induction welding which is a process of heating the material with electrical energy—in plastics, some forms of welding employ hot air and others use spin welding which causes heat by friction. There is no process called metal heat sealing. Plastic heat sealing was defined by the witness as "the bonding together of two or more layers of plastic materials by the use of heat, which can be categorized into two general areas, internal heat and the use of external heat * * *." The machine manufactured by the company which employs him is a heat sealing machine which seals plastic by use of internal heat created by the use of radio frequency. The frequency used by heat sealing machines is high and ranges from 18 megacycles to 250 megacycles. This specific machine operates on 37 megacycles.

The description of the heat induction process of the machine produced by his company was described as follows:

A. The process is basically similar to the process used in diathermy, which involves molecular agitation. In essence, the ma-

terial is placed in an electric field and the electric field alternates. It is polarized very rapidly, and the molecules, if they are of the proper type, attempt to orient themselves with the polarization of the field. So they rotate back and forth very rapidly. As they move heat is then induced within the material itself. The heat comes from the material.

The witness testified he is familiar with exhibit 1 and it is in his opinion an electronic heat sealing machine which is basically identical with the machine produced by his company. The machine can also be used to emboss the plastic for decorative purposes as well as appliqueing and creating a tear seal. A tear seal is one which can be used to create a boundary of the products.

In metal welding, heat is applied externally using electricity or gas. When using electricity, the line energy of 60 cycles is used, according to the witness.

Mr. Farkas stated that in metal welding, external heat is applied and the material is fused together by the creation of beads with a bonding agent. In heat sealing the material itself becomes liquid at one point and beads are generated from the material itself to cause the seal.

The witness further testified it is possible to emboss a design on metal with welding equipment but he did not believe such equipment is used in that manner.

Based upon the record and briefs, we find the following concessions made by the parties:

> 1. The imported marchandise does have as an essential feature an electrical element or device.
> 2. The Radyne machine is an apparatus, instrument or device.

By virtue of the presumption of correctness attaching to the classification of the collector as well as the first concession, there appears to be no question that the classification is correct unless the imported merchandise is in fact a welding apparatus, instrument or device. Since it is conceded that said machine is an instrument, apparatus or device, the issue is reduced to the question of whether the imported machine welds.

The common meaning of a term utilized by Congress in enacting a tariff provision is presumed to be the name of the article in a commercial sense. In the absence of evidence to the contrary, it is presumed to be the same as its meaning in ordinary use. *Swan* v. *Arthur*, 103 U.S. 597 (1880). Such use is to be determined as of the time of the enactment of the statute. *United States* v. *Victoria Gin Co., Inc., et al.*, 48 CCPA 33, C.A.D. 759 (1960).

Webster's New International Dictionary (1929) defines "weld" as follows:

> 1. To press or beat, as the ends of two iron bars, into intimate and permanent union, usually while softened by heat; also to unite

or form by a fusing heat, as bars or a joint in electric *welding*. *Welding* in the common way is extensively practiced with iron, and to a less extent with platinum, horn, and tortoise shell. Electric welding, in which the parts to be joined are heated to fusion by an electric arc (arc welding) or by passage of a large current through the junction, is used in uniting steel rails, making steel tubing, etc. See Thermite; cf. 1st. Braze, 1; Solder, 1.

2.  To unite closely or intimately; to join closely; as to *weld* the links in a chain of logic.

From the foregoing, it is apparent that prior to the enactment of the Tariff Act of 1930 welding encompassed not only metal but horn and tortoise shell. While both of these are organic matter, they are not man-made plastic. We, therefore, are of the opinion that articles of the type involved herein do not fall within the statutory provision for welding.

The position of plaintiff that since the Tariff Act of 1930 did not provide for plastics as such, it could not be expected to provide *eo nomine* for new machines that operate only on plastics is logically sound. Plaintiff also urges the court to consider the principle that tariff acts are written for the future.

This situation is quite similar to that involved in the case of *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669 (1957), wherein the court made the following comment:

> This case involves two well-established principles of customs law, one, that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of enactment of the act. *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, T.D. 40520; *United States* v. *O. Brager-Larsen*, 36 CCPA (Customs) 1, C.A.D. 388, and cases there cited; the other, that tariff acts are made for the future as well as the present, and will embrace merchandise which was not known to commerce at the time of their enactment. *United States* v. *Paul J. Downing et al.*, 16 Ct. Cust. Appls. 556, T.D. 43294; *Newman* v. *Arthur*, 109 U.S. 132, 27 L. Ed. 883.

> While it might appear superficially that those principles could, on occasion, be conflicting, a careful study of the decisions does not support such a view. The meaning of *eo nomine* provisions is to be determined as of the date of enactment but, when so determined, that meaning will embrace all subsequently created articles which fall within it. Tariff acts, therefore, are made for the future in the sense that they embrace articles not in existence at the time of enactment, but the meaning of words used in such acts is fixed at the time of enactment and does not fluctuate as the meaning of words might subsequently vary.

> That distinction was clearly set forth in the *Smillie* case as follows:

> > The rule [that the meaning of an *eo nomine* provision of a tariff act is that which it has at the time of enactment] of course, does not operate to exclude articles which are not

known at the time of passage of the act, but which come into being later. *As to all such articles the statute will be held to apply if the article possesses an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.* (Italics ours.) [Italics quoted.]

The court then concluded as follows:

On the record here, we think the meaning of the term "bentwood," at the time of enactment of the Tariff Act of 1930, supports the conclusion of the Customs Court that the instant merchandise would not have been eligible for admission under that paragraph. However, we fear we would be ignoring, or at least weakening, the well established doctrine that tariff acts are to be interpreted in light of their meaning at the time of their enactment, if we were to sustain the conclusion below that subsequent changes in meaning of the language used in tariff acts to prevail in the judicial process of ascertaining Congressional intent. * * *

In the case at bar it is true that Modern Plastics Encyclopedia (1967) gives the following definition of welding:

Welding—Joining thermoplastic pieces by one of several heat softening processes. * * * [Page 1092.]

In the same issue (1967) there is an article on "heat sealing" by Peter B. Black which opens with the following words on page 984:

The simplest method of joining or bonding thermoplastic films or fabrics to each other is with the use of heat. Heat sealing eliminates the need for sewing thread, adhesives and interleaf films provided the thermoplastic films are compatible and will fuse together to form a weld.

Among the factors which determine the type of sealing to use are the type of material to be welded, the configuration of the product, production requirements (which may or may not warrant tooling costs) and the quality of the weld.

However, this is some 37 years subsequent to the enactment of the 1930 Act. In earlier editions, 1962, of the same source welding of plastics was set forth as friction welding (spin welding), hot gas, and heated tool. Heat sealing was separately covered in various editions until 1967 and included the process utilized by the involved machines. The 1967 edition appears to cover the process utilized by the involved machines under both welding and heat sealing.

It is also interesting to note that plaintiff's own witness admitted that while machines such as are involved herein have been in existence for a number of years they have only been known to him as welding equipment for the past four years.

The basic question is whether Congress, when it utilized the language, welding apparatus, instruments and devices, intended to cover

a machine which performs the functions of exhibit 1. Based upon the information contained in Modern Plastics Encyclopedia, the involved machines are now designated by the industry under both welding and heat sealing. However, this is not sufficient to have them fall within the purview of the claimed language since definitions of a term at a later date may not be used to expand the definition of a tariff term. *Sears, Roebuck and Co.* v. *United States*, 46 CCPA 79, C.A.D. 701 (1959).

We are, therefore, of the opinion that the involved machines are not within the purview of welding apparatus, instruments or devices as contended by plaintiff. Plaintiff having failed to overcome the presumption of correctness attaching to the classification of the collector the claim in the protest is overruled.

Judgment will be entered accordingly.