**BORNEO SUMATRA TRADING CO., Inc.**

v.

**UNITED STATES.**

C.D. 3980; Protests Nos. 61/17396–6819, 63/6296–25250–61, and 63/6297– 25251–61.

United States Customs Court, First Division.
March 18, 1970.

Sharp, Partridge, Gants & Perkins, Washington, D. C. (James R. Sharp, Washington, D. C., of counsel) for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Harold L. Grossman, New York City, trial attorney), for defendant.

Before WATSON, MALETZ, and RE, Judges.

RE, Judge:

This case involves three protests which were consolidated for purpose of trial. The merchandise in protest 61/17396 consists of sheets, one-eighth of an inch in thickness, composed of standard hardboard with single veneers of Lauan (Philippine Mahogany) laminated to both sides, consisting of three plies, and cut to sizes intended for use in the manufacture of flush doors. The merchandise covered by protest 63/6296 consists of sheets, one-fourth of an inch in thickness, composed of standard hardboard with two veneers of Lauan laminated to both sides, consisting of five plies, and intended for use in the manufacture of panels. The merchandise in protest 63/6297 consists of sheets one-fourth of an inch in thickness, composed of standard hardboard with a single veneer of Lauan laminated to both sides, consisting of three plies and intended for use in the manufacture of panels. The merchandise was imported from Japan in 1958–1959 and is sold commercially under the trade name "Crownboard".

Upon liquidation, the collector of customs classified the merchandise as "plywood, other", under paragraph 405 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, and assessed duty at 20 per centum ad valorem, from which liquidation these protests were duly taken.

The plaintiff contends that the merchandise is properly dutiable at 12½ per centum ad valorem under paragraph 1403 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, as manufactures of pulp, not specially provided for. It is plaintiff's contention that merchandise consisting of layers of

veneer with a hardboard core is not "plywood" within the meaning of that term as used in paragraph 405 of the Tariff Act of 1930, as modified.

After trial, the protests were sustained, and it was held that "the merchandise involved herein is in chief value of hardboard, a manufacture of pulp, and is dutiable under paragraph 1403, as modified, as a manufacture of pulp." Borneo Sumatra Trading Co., Inc. v. United States, 56 Cust.Ct. 166, C.D. 2624 (1966).

The case was originally tried on a stipulation that was in part disapproved by the court, and the defendant moved for a rehearing on the ground that the existence of the stipulation caused it to try the case on a theory different from the one adopted by the court in its decision. Since justice required that the defendant should be given an opportunity to establish the proper classification of the merchandise, the motion was granted and a rehearing held pursuant to an order of this court dated May 10, 1966. The order vacated and set aside the prior judgment herein and restored the case to the calendar, "the issue being limited to the meaning of the term 'plywood' in paragraph 405 of the Tariff Act of 1930, and said paragraph, as modified."

A thorough examination of the voluminous record reveals that the question presented, as limited by the order granting the rehearing, is whether the subject merchandise, hardboard with Lauan veneer laminated to both sides and bearing the trade name "Crownboard", was properly classified under the *eo nomine* provision for "plywood" in paragraph 405 of the Tariff Act of 1930, as modified.

The two pertinent or competing tariff provisions may be set forth as follows:

Paragraph 405 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

"Plywood:

\* \* \* \* \* \*

Other .............. 20% ad val."

Paragraph 1403 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108:

"Manufactures of pulp, not specially provided for .............. 12½% ad val."

Perhaps the best description of the merchandise and its manufacture is to be found in the deposition taken pursuant to letters rogatory of Mr. Yoshizo Masuzawa, director in charge of general affairs of the Japanese manufacturer of the imported merchandise. "Crownboard" is the trade name of a product composed of veneers of wood laminated to a hardboard core. The component materials are veneers, used for the face and back surfaces, and hardboard used as the core. Mr. Masuzawa explained: "We cut the log on a lathe [blade] into veneers for use as the surfaces. Hardboard is inserted in between the veneers, and these components are bonded together by a resinous substance and pressed into a solid panel."

The wood used for the veneers was Lauan, purchased from various sources, and the hardboard cores were purchased from the Tokyo Hardboard Industrial Company. Mr. Masuzawa's firm manufactured "Crownboard" in three thicknesses: ⅛", ³⁄₁₆", and ¼". This ⅛" "Crownboard" has three plies consisting of the face and back veneers, and a hardboard core. The ³⁄₁₆" and ¼" "Crownboard" may have either three or five plies. As thus described, the question presented is whether "Crownboard" is "plywood" within the meaning of the applicable provision of the tariff act.

Since as used in the Tariff Act of 1930, "plywood" is an *eo nomine* term, the court must be guided by the "common meaning" of that term recognizing that the "common meaning", unless the contrary is shown, is the same as the "meaning in commerce." Swan v. Arthur, 103 U.S. 597, 598, 26 L.Ed. 525 (1881); United States v. Victoria Gin Co., Inc. et al., 48 CCPA 33, 35, C.A.D.

759 (1960). It must be stated at the outset that there can be no question that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of enactment of the act. See Smillie & Co. v. United States, 12 Ct. Cust.Appls. 365, 367, T.D. 40520 (1924); United States v. Brager-Larsen, 36 CCPA 1, 3–4, C.A.D. 388 (1948), and cases cited therein. This court has also determined the common meaning of an *eo nomine* provision as of the date of importation. The instant protests, however, do not come within that exception. Since the provision for plywood is not conditioned on its use for a specified purpose, the meaning that must govern is the one that prevailed at the time of the enactment of the Tariff Act of 1930. See Wilbur-Ellis Co. et al. v. United States, 18 CCPA 472, 479, T.D. 44762 (1931).

An equally well established rule is that "[t]he common meaning to be attached to a term or word used by the Congress in a provision of a tariff act is a matter to be determined by the court having the same under consideration." United States v. John B. Stetson Co., 21 CCPA 3, 9, T.D. 46319 (1933), J. E. Bernard & Co., Inc. v. United States, 63 Cust.Ct. ——, C.D. 3871 (1969). As recently restated by this court in Burrows Equipment Company v. United States, 62 Cust.Ct. 681, C.D. 3848, 300 F.Supp. 455 (1969), its ascertainment is "a matter of law to be determined by the court on the basis of its own understanding of what that meaning is * * * and in reaching its conclusion * * * the court may use as an aid relevant lexicographic and other standard authorities."

At the first trial of this action, the parties, in paragraph 1 of their stipulation, stipulated that the imported merchandise was "commonly known in the commerce and industry of the United States as a special construction of plywood." Judge Nichols, after the first trial, speaking for the court, held that language to be "a stipulation of law if construed as stipulating that the common meaning of the word 'plywood' includes the merchandise at bar." *Borneo Sumatra Trading Co., Inc., supra* at 172. The court agrees with the conclusion that the stipulation trespasses upon the court's province in the determination of a matter of law.

The court in the prior decision also held that the language in paragraph 1 of the stipulation was insufficient to establish that the imported merchandise was plywood under the rule of commercial designation. It recognized that commercial designation, if different from common meaning, is a matter of *fact* to be proved (United States v. E. Dillingham, Inc., 41 CCPA 221, 224, C.A.D. 555 (1954)), and, therefore, properly the subject of a stipulation. Judge Nichols, however, distinguished between merchandise that is designated *uniformly, generally* and *definitely* and that which is "commonly known". The court found that the stipulated language fell far short of the requirement that the merchandise must be uniformly, generally and definitely designated in the trade, wherever bought and sold, in order for the rule of commercial designation to apply. Consequently, the stipulation was also held to be insufficient to establish the fact that the imported merchandise was commercially designated as plywood.

Defendant at the rehearing disclaimed any intention to establish that "Crownboard" is plywood under the rule of commercial designation. Hardboard was not in existence in 1930 and therefore "Crownboard" could not have been known as plywood at the time of enactment of the Tariff Act of 1930. Defendant, however, claims that "Crownboard" is a form of plywood which came into existence thereafter, and that an *eo nomine* designation includes all forms of that product including articles unknown at the time the provision was enacted. While it is true that an *eo nomine* classification embraces subsequently created articles where "the language fairly and clearly includes them", Newman v. Arthur, 109 U.S. 132, 3 S.Ct. 88, 27 L.Ed. 883 (1883), the question still remains whether the particular product, "Crown-

board" in this instance, is plywood within the meaning of the Tariff Act of 1930. The court concludes, for the reasons set forth below, that it is not.

In order to arrive at the meaning of plywood in the Tariff Act of 1930, the court must look to the legislative intent at the time of its enactment. It is well established that in determining legislative intent, the court may properly rely upon the Summaries of Tariff Information. United States v. J. Eisenberg, Inc., 43 CCPA 105, 108, C.A.D. 616 (1956). The court has therefore examined the Summary of Tariff Information, 1929, which was before the Congress in considering the Tariff Act of 1930. That examination revealed that plywood not only consists of wood plies but also involves the element of the grain of the wood. According to the Summary, the placing of the grains at right angles to each other is important in the construction of plywood. The particular manner by which plywood is constructed was recognized by this court in B. A. McKenzie Co., Inc. et al. v. United States, 41 Cust.Ct. 43, 47, 49, C.D. 2019 (1958), aff'd, 47 CCPA 42, C.A.D. 726 (1959). Although not called upon to determine the common meaning of plywood, the court in that case noted that plywood was a manufacture of wood and described it as "a wood product made in a certain way."

One would conclude from the definition of plywood in the Summary that it is precisely the manner in which the grains are placed that gives the resulting product its strength and distinguishing features:

*Summary Of Tariff Information,* 1929, Schedule 4, p. 960:

"Plywood is a combination of several plies or sheets of veneer glued together so that the grain on each ply is at right angles to the adjacent ply. It is made in odd multiple plies of 3, 5, 7, 9, etc. There are two distinct types: (1) Panels, referring to three or more glued-up plies of veneer, in which the *face ply, core* (*inside* ply or plies) and *back* ply are each of *veneer*; and (2) tops, referring to the use of a core of lumber (½ to 1 inch or more in thickness) faced and backed with from one to four or more plies of veneer. * * *" [Emphasis added.]

As noted previously it is a basic principle of customs law that the court, in determining the common meaning of a tariff term, may consult lexicographic definitions, written authorities and the testimony of expert witnesses. Such evidence, however, is merely advisory, and is "not operative in the face of contrary legislative intent." Victoria Gin Co., Inc., et al. v. United States, 43 Cust. Ct. 166, 168, C.D. 2121 (1959), reversed on other grounds, 48 CCPA 33 (1960), *supra*; United States v. Brager-Larsen, 36 CCPA 1, 3, C.A.D. 388 (1948); Knauth, Nachod &. Kuhne v. United States, 6 Ct.Cust.Appls. 128, 130, T.D. 35389 (1915). Moreover, such authorities may properly aid in ascertaining common meaning only if they relate to the period immediately prior to or contemporaneous with the adoption of the particular tariff provision.

The court has also examined the earliest American book published on plywood. It should be noted that the Tariff Act of 1922 had no provision that dealt with plywood. In providing for the new classification for plywood in 1930, it may be presumed, therefore, that Congress was not unaware of its meaning in the trade as defined in that publication and as described in the dictionaries of that period. Thus, in E. V. Knight & M. Wulpi, Veneers & Plywood, 1927, *plywood* was distinguished from other veneered products and was defined as "a combination of several plies or pieces of veneer glued together usually so that the grain of any one ply is at right angles to the adjacent ply or plies." (Pp. 110–111) Laminated wood, another of the veneered products, was defined as "constructions in which two or more layers of wood are fastened together with the grain of all plies or laminations parallel." This distinction, it may be added, also

exists today and is not without significance.

Indicative of the common understanding of the term are the following definitions of plywood from lexicographic authorities of that period:

Funk & Wagnalls, New Standard Dictionary of the English Language, 1931.

"a compound *wood* with surfaces of *veneer* and built up of two or more plies glued or cemented together under pressure." [Emphasis added.]

Chamber's Twentieth Century Dictionary, 1931.

"a thin board made up from three very thin layers of *wood*, the grain of the middle layer at right angles to the grain of the outer two, cemented together under pressure." [Emphasis added.]

The Shorter Oxford English Dictionary, 1934.

"a compound *wood* made of three (five, etc.) thin layers glued or cemented together under pressure, and arranged so that the grain of one layer runs at right angles to the grain of any adjacent layer." [Emphasis added.]

Webster's Dictionary, 1934.

"*wood* made up of an odd number of veneer sheets glued together, the grains of the layers being (usually) at right angles to one another." [Emphasis added.]

Although these dictionaries were published after enactment of the Tariff Act of 1930, it is common knowledge that lexicographic works take years to prepare, and it is therefore fair to say that they reflected the common understanding of the term plywood during the period in question.

 All of the foregoing definitions uniformly indicate that the chief characteristics of plywood consisted of a combination of plies of wood arranged with the grain direction of alternate plies at right angles. These are the characteristics or qualities which distinguished it from all other products of the time. In providing for a new classification of plywood in the Tariff Act of 1930, the court may assume not only that the Congress was aware of the commercial understanding of the term in the trade but also that it relied and adopted that meaning especially in light of the definition contained in the 1929 Summary of Tariff Information.

The functions served by this cross-graining were described by Dr. Frederick F. Wangaard, one of the five witnesses called by the plaintiff at the rehearing. Dr. Wangaard, professor of forest products at Yale University, who for over thirty years had been engaged in teaching and research on wood products, their properties, manufacture and processing, stated:

"In general, wood has extremely different properties in the direction of the grain as compared with the direction across the grain. It is, for example, 60 times as stable dimensionally along the grain as it is across the grain. This has to do with the response in dimension to changes in moisture content which take place all the time with fluctuating humidities of the atmosphere. Second, wood is 20 times as stiff along the grain as it is in the direction across the grain, and this has an enormous influence on panels that may be made up as to whether the plies are arranged parallel or perpendicular to one another."

In answer to a question by the court as to whether there was any historical reason for the differences between plywood, laminated wood, and a third veneered product described in the previously cited work, Veneers & Plywood, as cross-banded veneer panels, Dr. Wangaard testified:

"There was a time, and it is pointed out, a state of considerable confusion, none of these products was born fully recognized by a name, and prior to these definitions that appeared about 1927, there actually were products that were just generally classed together as veneered products, and the term 've-

neer' had a rather serious and unfortunate connotation of a very thin decorative skin covering some inferior substance, and it was largely because of this that the more specific technical terminology came into being, and laminated wood, in which the *layers of wood were laid together with the grain paralleled,* different characteristics, and they were suitable for different uses than was a material in which the plies were laid crosswise. Consequently, there was a very important distinction, and is today remaining, between laminated wood and plywood." [Emphasis added.]

This distinction between plywood and laminated wood has appeared in various publications since 1927. See Chamber's Twentieth Century Dictionary, 1931; T. D. Perry, Modern Plywood, 1942; Webster's Third New International Dictionary Unabridged, 1968.

It is clear from the definition of plywood that the essential characteristic of crossgraining requires that all of the plies, including the core, must consist of wood. This is explicit in the 1929 Summary of Tariff Information which speaks only of cores of veneer or lumber. Dr. Wangaard described the "basic characteristics" of plywood as follows:

" * * * first a crossbanding or crossgraining, a crossing of the grain of alternate plies, and second, that the core materials of plywood consist of veneer or lumber."

Commenting on the utilization and stability of noncrossgrained products, such as the merchandise at bar, Dr. Wangaard stated:

"They would be much less stable dimensionally than plywood having a veneer core in the place of the hardboard core, and having it laid up in the normal right angle direction to the grain of the face ply * * * [and] because of that * * * subject to much more warpage than a plywood panel."

While veneers and lumber core are both wood, and therefore have grains running in one general direction through the wood, hardboard, in the words of one of defendant's witnesses, is "actually made, is fibered, and put together under heat and pressure, and * * * does not have a grain."

Since it does not contain the element of crossgraining, defendant, in its brief, concedes that the controverted merchandise would not come within the previous definitions of plywood. It, nevertheless, contends that combinations of veneers and particleboard or other composition material were within the common meaning of the term "plywood" as used in 1930 by the plywood industry. In support of that contention, defendant introduced into evidence Commercial Standard 35–61 (CS35–61), published by the Department of Commerce in 1961, which purported to describe the trade practices and standards of the hardwood plywood manufacturers in and about the years 1958 and 1959 when the merchandise at bar was imported.

Defendant, however, goes further and maintains that Commercial Standard 35–61, entitled Hardwood Plywood, which contains the following definitions, reflects the common meaning of plywood as understood by the industry in 1930:

"Plywood.—A cross-banded assembly made of layers of veneer, or veneer in combination with a lumber core, particleboard core, or other type of composition material, or plies joined with an adhesive. Three types of plywood are recognized, namely, veneer plywood, lumber-core plywood, and particleboard plywood. (Except for special construction, the grain of one or more plies is approximately at right angles to that of the other plies; and an odd number of plies is used.)"

"Cores * * * may be of sawn lumber, either one piece or several pieces joined and glued, or they may be of veneer or they may be of particleboard core."

To state that the descriptions set forth in Commercial Standard 35–61 represented trade practices and standards

in 1958 and 1959 is one thing, but to assert that they reflected the common meaning of plywood, as understood by the industry in 1930, is an entirely different matter. That this contention of defendant is without support and untenable is clear from its admission that no reference to cores consisting of other than veneer or lumber appeared in any of the commercial standards prior to 1961.

Assuming for purpose of discussion only, that hardboard is a type of particleboard and that particleboard is now recognized by the industry as core material in the construction of plywood, it does not follow that "Crownboard" is plywood within the meaning of that term as contained in the Tariff Act of 1930. As stated previously, the common meaning of an *eo nomine* provision used in a tariff act must be determined as of the date of its enactment and not some subsequent date. This well-established principle was also expressed in Davies Turner & Co. v. United States, 45 CCPA 39, 42, C.A.D. 669 (1957), wherein the appellate court stated:

> " * * * the meaning of words used in such acts is fixed at the time of enactment *and does not fluctuate as the meaning of words* might subsequently vary." [Emphasis added.]

That the concept of plywood did in fact undergo some change, at least as far as the industry's practices were concerned, is evident from an examination of a commercial standard in effect at about the time of the adoption of the Tariff Act of 1930. In CS35–31, a commercial standard which became effective in 1931, plywood was defined as:

> "A product in which several plies or pieces of veneer (thin wood) are glued to each other or to a lumber core. The grain of any one ply is usually at right angles to the adjacent layers and the laminated structure is stronger than a solid piece of lumber of equal dimensions."

Cores also were defined in CS35–31 and were stated to be "the innermost portions of plywood * * * of sawn lumber, either one piece or several pieces joined and glued, or they may be of veneer." The standard made further reference to the fact that "*cores and crossbandings* for commercial standard plywood shall be made in an approved manner of any suitable *wood.*" [Emphasis added.]

The defendant represented the commercial standards as containing rules "established as a universal basis of commercial understanding in the plywood industry." Although not binding on the court in its determination of the common meaning of an *eo nomine* provision as used in a tariff act, in 1930 or at any time, the court has, nevertheless, noted the commercial standards of 1931 as well as those published thereafter. This examination has left no doubt that plywood in 1930 and 1931 was regarded by the plywood industry as essentially an all wood product with crossgraining. That it continued to be so regarded, for many years after, is clear from the definitions of plywood in CS35–42, CS35–47, and CS35–49 which described it as an odd ply product of veneer, or a combination of veneer and lumber core, with crossgraining at right angles. It is likewise clear that it was not until the commercial standard of 1961 that there appeared a broadened definition of plywood which contained something other than wood as its core material.

The fact that the commercial standard in 1961 included a definition for plywood which embraced cores other than wood in no way reflects the legislative intent at the time that the provision for plywood was included in the Tariff Act of 1930. See Victoria Gin Co., Inc., et al. v. United States, *supra*, 43 Cust.Ct. at 171. That which occurred three decades later reflected a change and not a confirmation of a previously existing legislative intent. See Jacques Isler Corp. v. United States, 63 Cust. Ct. ——, C.D. 3909 (1969), appeal pending. The change reflected in the standard of 1961 indicates that the meaning in 1930 was otherwise, and also that

it did not occur until after the importations at bar.

■ That a subsequent expanded definition of a term cannot prevail in determining its meaning under a tariff act is illustrated by the case of Sears, Roebuck and Co. v. United States, 46 CCPA 79, 82, C.A.D. 701 (1959). In the *Sears, Roebuck and Co.* case, the Court of Customs and Patent Appeals affirmed a judgment of this court which had sustained the collector's classification of certain umbrella-shaped articles under paragraph 1312 of the Tariff Act of 1930, as modified, as manufactures in chief value of rayon, not specially provided for. The plaintiff contended that the importations were properly classifiable under the *eo nomine* provision for umbrellas in paragraph 1554, as modified. The merchandise was admittedly used to protect food from insects. The court construed the meaning of the term "umbrella" as embracing only articles used as a protection against the sun or rain. It disregarded a dictionary definition for umbrella, published subsequent to the enactment of the Tariff Act of 1930, which also described it as an article "serving to screen, shelter or protect." The court stated that the definition could not be used "to expand the meaning of 'umbrellas' at the date of enactment of the 1930 Act, but solely to clarify the meaning at that time."

In the *Sears, Roebuck and Co.* case the subsequent dictionary definition of umbrella could not expand the meaning of the term within the intendment of the Tariff Act of 1930. In the case at bar, neither can the 1961 standard in CS35–61 expand the meaning of plywood when the question presented pertains to its meaning within the Tariff Act of 1930. See also Jomac-North, Inc. v. United States, 63 Cust.Ct. ——, C.D. 3892 (1969).

Without determining the extent to which plywood underwent a change or fluctuation in meaning in 1961, it may nevertheless be observed that the broadened definition was not recognized by the Tariff Schedules of the United States published in 1963. Headnote 1(b), schedule 2, part 3 of the schedules assigned the following meaning to plywood:

"(b) *Plywood:* Rigid wood-veneer assemblies bonded together with adhesive substances having a central ply or core of wood veneer or lumber with one or more plies of wood veneer on each side thereof, the grain of at least one ply being at an angle (usually a right angle) with the grain of one or more of the other plies, including such assemblies the face ply (or plies) of which has been mechanically scored, striated, or similarly processed;"

The schedules also recognized wood products with a particleboard core in the definition of wood veneer panels in headnote 1(c) of part 3:

"(c) *Wood-veneer panels:* Rigid wood-veneer assemblies, bonded together with adhesive substances, except plywood, with a wood-veneer ply on one side of a backing, or on both sides of a core, which backing or core may be composed of lumber, veneer, hardboard, wood particle board, or other material, including such assemblies the face ply (or plies) of which has been mechanically scored, striated, or similarly processed;"

Defendant also urges another principle applicable to common meaning. Specifically, in its brief, defendant states:

"While we recognize that the scientific and technical definitions revealed by plaintiff's documentary evidence do not *per se* encompass the merchandise at bar, this fact does not control the determination of the Court as to the common meaning of a tariff term in the face of common knowledge of differing popular usage of the term, or of evidence, offered as an aid to the court in making its determination, of a differing meaning or understanding of the term in the trade and commerce of the United States dealing

in such commodity or article." (Defendant's brief, p. 25)

In support of this contention defendant cites the cases of Meyer & Lange et al. v. United States, 6 Ct.Cust.Appls. 181, T.D. 35436 (1915), and Chester K. Stoner v. United States, 42 Cust.Ct. 178, C.D. 2083 (1959). These cases, however, show that the respective tariff terms admittedly possessed different commercial and scientific meanings at the time they were enacted into law.

In the *Meyer & Lange* case, "tunny" fish, while a mackerel "in the eye of science", was held not to be classifiable under the *eo nomine* provision for mackerel under the Tariff Act of 1909 since it was not then "popularly or commercially known as such." The court observed that "notwithstanding the fact that science has given the name 'mackerel' to a whole family of fishes, popular usage may limit the designation to a particular species of the family or extend it to fishes which, scientifically speaking, are not mackerel at all."

The merchandise in the *Chester K. Stoner* case consisted of baskets made of a substance known as "carrizo". Although "carrizo", in a technical and a scientific sense, was not bamboo, the court upheld the importer's claim for classification under paragraph 411 of the Tariff Act of 1930 as "baskets of bamboo". The record therein, however, demonstrated that the baskets were "known, bought, and sold as bamboo baskets" in the trade and commerce of the United States "at, prior, and since the passage of the Tariff Act of 1930".

These cases rest on a principle that tariff acts are drafted not in terms of science but in the language of commerce, and is presumptively that which is in common use. Two Hundred Chests of Tea, 22 U.S. (9 Wheat.) 430, 6 L.Ed. 128 (1824); Central Commercial Co. et al. v. United States, 11 Ct.Cust.Appls. 131, T.D. 38935 (1921). It is not applicable in a case where, as in the case at bar, the scientific and commercial meanings are the same. The record here-

in shows that there is no question that the common meaning of plywood was essentially the same as that which appeared in the only then existing publication on plywood (Veneers & Plywood, 1927), and the commercial standard of that time (CS35–31). The standard dictionaries of the day reflected the popular usage of the term "plywood" to be the same as the "scientific and technical definition." Furthermore, neither the *Meyer & Lange* case nor the *Chester K. Stoner* case dealt with a broadened definition of a term, nor with an article that did not exist at the time the *eo nomine* provision was enacted into law.

The defendant also relies on an "essential resemblance" test and asserts that:

"* * * in the trade and commerce of the United States dealing in such commodity or article, a meaning and understanding of the term 'plywood' different from its aforesaid delineation prevailed, and that this common and commercial meaning encompassed and included the subject articles, which, as the record clearly reveals, 'possess an essential resemblance to the ones named in the statute (plywood) in those particulars which the statute (paragraph 405, supra) established as the criteria of the classification' * * *." (Defendant's brief, p. 26.)

The "essential resemblance" test has been the subject of recent judicial comment. Although the defendant cites the cases of Hoyt, Shepston & Sciaroni et al. v. United States, 52 CCPA 101, C.A.D. 865 (1965), and The Bendix Corporation v. United States, 57 Cust.Ct. 184, C.D. 2759 (1966), it is interesting to note that the test was not met in either of them.

In Hoyt, Shepston & Sciaroni et al. v. United States, 52 Cust.Ct. 7, C.D. 2426 (1964), sausage casings comprising outer casings of hog bung lined with viscon, a synthetic material, had been classified as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930, as modified. The importer

claimed classification under the *eo nomine* designation of sausage casings, weasands, intestines, bladders, tendons, and integuments not specially provided for, under paragraph 1755 of the act which was a duty free provision. It was agreed that casings of the type imported were not known at the time of the Tariff Act of 1930. The court found the common meaning of the *eo nomine* provision of paragraph 1755 for sausage casings to consist of casings "made wholly of animal products" and to exclude casings "made wholly of artificial products." It reviewed the legislative history of paragraph 1755 to determine whether casings made in part of natural products and in part of synthetic materials possessed essential resemblance to the criteria for classification of natural sausage casings under paragraph 1755. In holding that the statutory criteria of the sausage casings required that they be made of animal parts or organs, the court concluded that the imported merchandise did not substantially resemble natural sausage casings, and overruled the protest. The Court of Customs and Patent Appeals affirmed and stressed that the "controlling factor" in the case, as in others cited by the importer in support of the "essential resemblance" test, was "the meaning of a particular term." It concluded that the importations, which included linings of artificial material, constituted "more than natural sausage casings falling under paragraph 1755 and do not resemble such natural sausage casings as to the criteria for their classification." 52 CCPA at 105.

Similarly, in *The Bendix Corporation* case, the court did not find an "essential resemblance" between an instrument known as a "Polarmatic 62," and a polarimeter in the particulars which paragraph 228(a) of the Tariff Act of 1930, as modified, established as the criteria of classification for polarimeters and other articles enumerated therein. Although the "Polarmatic 62" had "some attributes in common with a polarimeter," the court found that they were "very different in construction" and that

they were used for entirely different purposes. It held that any extension of paragraph 228(a) to "like or similar articles is not provided for and would frustrate the arrangement of the paragraph." Hence, the court concluded that the term "polarimeter," as understood in 1930, would not have included the "Polarmatic 62" had it been in existence at the time.

In its attempt to establish an "essential resemblance" between "Crownboard" and "plywood," as understood in 1930, the defendant, at the rehearing, called four witnesses all of whom were engaged in "producing, buying, and selling plywood, and particularly hardwood plywood." Plaintiff indicates that these witnesses are not objective in their testimony since all were instrumental in having brought about in 1961 the broadened definition of plywood in CS35–61. Notwithstanding that fact, it may be added that their conception of plywood was completely at variance with one another. They were only in agreement in their opinion that "Crownboard" is plywood. This may be explained by the fact that all of defendant's witnesses viewed the merchandise at bar from the standpoint of its saleability. In their view, it was plywood because it looked like plywood and was used for the same purpose as plywood. Moreover, their definitions of plywood were based on the present day sales practices of the manufacturers by whom they were employed.

For example, Mr. Oscar Witt, product coordinator of the hardwood division of the Weyerhaeuser Company, testified that plywood was "[t]wo or more layers bonded together under pressure, glued together, whatever you call it" and that "[a]t least one [of the layers] must be wood."

Mr. Carl D. Wheeler, vice president of the U.S. Plywood Corporation, stated that plywood "would be an assembly of sheets of veneer, or a composition material * * * is put together with glue * * * and * * * a cross laminated feature, or a cross-plied feature which gives it stability." On cross-examination, Mr. Wheeler said that if the manufacturer

makes a bonded product with a face veneer on it, and sells it as plywood, it becomes plywood. To Mr. Wheeler, "[p]lywood is what you call it."

According to Mr. Francis J. Haslach, marketing manager of the U.S. Plywood Corporation, three pieces of veneer bonded together with the grain going all in the same direction would be plywood "if the manufacturer and the end user so specified." His description of plywood was "creation plus lamination, and that is where I leave it."

In the opinion of Mr. Clark E. McDonald, managing director of the Hardwood Plywood Manufacturers Association, the merchandise at bar resembles plywood with a veneer or lumber core because "it looks the same on the outside." When asked if it made any difference what was on the inside, Mr. McDonald replied: "No, sir, it depends on the end use of the product whether the customer is happy or not."

The definitions given by defendant's witnesses are so vague that they provide little assistance to the court. Indeed, many of them do violence to the very standard which the witnesses helped establish in CS35–61.

Plaintiff's witnesses viewed the imported merchandise on the basis of the physical properties of various wood products, and their classification in accordance with standard definitions. For example, Mr. Felix J. Danon, sales manager for the plaintiff corporation, was questioned as to the differences in characteristics between "Crownboard" and "plywood." He stated: "[d]elamination in Crownboard, extreme delamination as opposed to very limited, if none, in plywood, as occurs in plywood; a factor of shrinkage, and the sheets would warp." He added that "Crownboard" would warp "because of the movement within the sheets themselves * * * [t]he movement of the physical characteristics of the hardboard core as opposed to the plywood face and back." He continued: "There were opposing forces there, and this tended to warp the sheets much more

than you would find in a crossgrain product such as plywood, where you use a veneer or lumber core at perpendicular angles to the adjacent layer." This statement not only was not controverted by any of the other witnesses, but is also substantiated by the 1929 Summary of Tariff Information, which states:

"Plywood construction results in greater strength than a single piece of wood of equal thickness, practically eliminates checking and warping, and permits the use of a face ply of fine cabinet wood glued to more common woods." Schedule 4, p. 960.

The court consequently cannot subscribe to an application of the "essential resemblance" test based on outward appearances only. The resemblance to be essential must pertain to "essence", and as defined in Webster's New World Dictionary of the American Language, College Edition, 1962, essence is "that which makes something what it is." A similar definition is contained in Webster's Third New International Dictionary, Unabridged, 1968.

Within the intendment of the Tariff Act of 1930, that which makes plywood "what it is", is the crossgraining of an odd number of plies of wood at right angles to one another. "Crownboard", as well as other products referred to by defendant's witnesses which, in their opinion, would be sold as plywood today, does not have the element of crossgraining, much less the element of wood in all of its parts. Though the Tariff Act of 1930 could not have envisaged all forms of plywood, the decisions of this court, which have included unknown articles under an *eo nomine* provision, have required that they be forms of or essentially resemble the article. See Consolidated International Equipment & Supply Co. v. United States, 63 Cust.Ct. ——, C.D. 3901 (1969). The court cannot agree that an article, for tariff purposes, is necessarily "what you call it." Surely, defendant would not suggest that something is plywood merely because someone calls it plywood. As for the "essential resem-

blance" test, the resemblance must be essential and not merely one of appearance only. A piece of glass, for example, is not a diamond merely because it may to some look like one.

As indicated previously, in the *B. A. McKenzie Co.* case this court noted that plywood is "a wood product made in a certain way." Its *essentiality* has to do with component materials and its manner of construction. To eliminate wood, and substitute anything else, such as hardboard, would cause it to lose not merely form, but essence. It is clear, therefore, that not only "Crownboard" but also many of the products called plywood by defendant's witnesses would not satisfy the criteria established by Congress in the Tariff Act of 1930. The legislative intent expressed in the Tariff Schedules of the United States remained essentially the same despite the inclusion of particleboard as a new type core in the 1961 definition of plywood in CS35–61. As admitted by Mr. Clark E. McDonald, one of defendant's witnesses, hardboard, the core material for "Crownboard", would not meet the specifications for particleboard in CS35–61. Although the common meaning of plywood under the Tariff Act of 1930 has not heretofore been determined by the court, it would seem clear that it was not changed in 1963. See Floral Arts Studio et al. v. United States, 39 Cust.Ct. 287, C.D. 1943 (1957), aff'd, 46 CCPA 21, C.A.D. 690 (1958).

Furthermore, according to standard lexicographic authorities during this entire period and later, the definition of plywood has continued to require more than merely plies, but also wood grains. There is also retained the distinction between plywood and laminated wood. See T. D. Perry Modern Plywood 11 (1942); A. D. Wood & T. G. Linn, Plywoods 9 (1943); Webster's New International Dictionary, 2d ed. (1949); Simonds, Wirth & Bigelow, Handbook of Plastics 587 (1949); Wood Handbook, U. S. Forest Products Laboratory 487 (1955); Webster's New World Dictionary of the American Language, College Edition (1962); Webster's Third New Interna-

tional Dictionary of the English Language, Unabridged (1968). Indeed, the definition found in the most recent lexicographic work describes plywood as "a structural material made of layers of wood * * *." The American Heritage Dictionary of the English Language (1969).

██ Defendant's witnesses indicate that there has been a change in the sales practices of some salesmen in the plywood industry. Defendant seems to rely upon the principle that the merchandising medium through which articles are sold may have important probative value on the question of their tariff classification. While this is true, nevertheless as stated recently in Nomura (America) Corp. v. United States, 62 Cust.Ct. 524, 532, C.D. 3820, 299 F.Supp. 535, 542 (1969), appeal pending, the merchandising medium "is not always determinative of their classification." In view of the entire record herein, such practices would be of little value. The question before the court is the common meaning of a tariff term in 1930, not in 1958 or 1959, nor in 1970. The court is not concerned, therefore, with the names by which the trade, or part of it, knew other articles at a date subsequent to the time in issue.

Regardless of the effect of CS35–61 in 1961, it is clear that it was not a commercial standard known to the Congress and within its legislative intendment in 1930. It was not in existence even in 1958 and 1959 when the merchandise in issue was imported. From the record produced at the trial and the rehearing, it is clear that the legislature had in mind in 1930, when it provided for the *eo nomine* classification of plywood, an all wood product of plies and core with grains adjacent to the plies at right angles.

The court has carefully examined the numerous cases cited by the defendant. For example, defendant has stressed that tariff acts are "written for the future", and that certain articles are deemed to be technological advancements or com-

mercially sophisticated versions of *eo nomine* provisions for merchandise. R. J. Saunders & Co., Inc. v. United States, 49 CCPA 87, C.A.D. 801 (1962); United States v. L. A. Salomon & Bro., 22 CCPA 490, T.D. 47483 (1935). These cases, however, are not entirely germane for in the case at bar the question is not whether the imported merchandise is a form of a product but whether it is that product at all. Thus, in Nootka Packing Co. et al. v. United States, 22 CCPA 464, T.D. 47464 (1935), clam meat, minced, cooked and canned in brine, was held to fall within the *eo nomine* designation for clams under paragraph 721(b) of the Tariff Act of 1930 rather than under a provision for preserved shellfish in paragraph 1761 of that act. The appellate court reiterated the oft-applied principle to the effect that "where an article is designated without words of limitation, that designation will generally include the article in all its forms known to commerce." United States v. General Hide & Skin Corporation, 11 Ct.Cust.Appls. 78, T.D. 38731 (1921).

The dissenting opinion of Judge Bland, in elaborating on the principle, indicates that:

> "It is true that the *eo nomine* provision for an article will ordinarily include all forms of that article, if it still *remains that particular article,* but if *its identity has been destroyed,* and if by processing it has become a new article, it of course cannot be included in the *eo nomine* provision." [Emphasis added.] 22 CCPA at 473.

The crucial factor in the cases involving *eo nomine* provisions is in establishing the identity of the article defined and, once established, in maintaining that identity in all of its various forms. In the *Nootka Packing Co.* case, if identity of the prepared article had been deemed to be lost by the court, classification under the *eo nomine* provision for clams would not have been proper as it would not then qualify as a "form" of that article. Conversely, if the identity of the "new" article is not established, in that it is lacking in the particulars which

identify all other articles known by that name, then that article would likewise fail to qualify as a "form" of the article.

The principle that an *eo nomine* provision includes all forms of the article was recently applied by the court in a case that held that "wader boots" were properly classified under a tariff provision for "[b]oots, shoes, or other footwear", since they performed *"essentially* the function of boots even though they may also protect other parts of the body." Nomura (America) Corp. v. United States, 62 Cust.Ct. at 531. [Emphasis in original.] See also Astra Trading Corp. v. United States, 56 Cust.Ct. 555, C.D. 2073 (1966).

In the instant protests, the court has not had to decide whether "plywood" has been dealt with, refined, enlarged, or advanced as in the *B. A. McKenzie & Co.* case, *supra,* but whether the merchandise at bar is plywood to begin with. Once the identity of a product is known, clearly all forms of that product, which retain its identity, are included under the *eo nomine* provision in a tariff act. Such subsequent forms, however, must fall within the scope of the product as defined at the time the *eo nomine* provision was adopted. Sears, Roebuck and Co. v. United States, *supra,* 46 CCPA at 82. It does not follow that any and all articles that may be called by the name of the original product are to be classified under the *eo nomine* provision. R. F. Downing & Co. v. United States, 9 Treas.Dec. 1012, 141 F. 490, T.D. 26454 (1905). In the case at bar, "Crownboard" cannot be said to be an improved model or version of the original article "plywood".

In view of the limited purpose of the rehearing, the court need not decide other issues raised. Although the prior judgment of the court was vacated to allow for the rehearing, the decision of the court held that the merchandise herein was "in chief value of hardboard, a manufacture of pulp, and is dutiable under paragraph 1403, as modified, as a manufacture of pulp." The court concurs in

that finding and holds that it is fully supported by the record of the first trial.

Plaintiff has established not only that the classification of the controverted merchandise is erroneous, but also that the proper classification should be under paragraph 1403 of the Tariff Act of 1930, as modified. The protests are therefore sustained. Judgment will issue accordingly.