AMERICAN SCIENTIFIC PRODUCTS, DIV. OF AMERICAN HOSPITAL SUPPLY CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 86–03–00274

(Decided May 14, 1990)

*Katten Muchin & Zavis* (*Mark S. Zolno* and *Lynn S. Baker*) for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Mark S. Sochaczewsky*) for defendant.

TSOUCALAS, *Judge:* This action, designated as a test case, comes before the court pursuant to 28 U.S.C. § 1581(a) (1982) upon a challenge to Customs' classification of certain hematology analysis equipment imported from Japan. Plaintiff, American Scientific Products ("American"), contests the classification of its imported merchandise under item 712.49 of the Tariff Schedules of the United States (1985) ("TSUS"), on grounds that the equipment neither "measures" nor

"analyzes" within the meaning of that TSUS provision. Rather, plaintiff claims, the equipment is provided for *eo nomine* under item 676.15, TSUS; or alternatively, under items 676.25 or 678.50, TSUS. *Plaintiff's Brief* at 16–19. Furthermore, plaintiff maintains the printers are covered by item 676.30, TSUS. *Id.* at 45. Defendant maintains that the equipment is properly classified under item 712.49, TSUS, as its function is to "analyze" within the meaning of that item.

## BACKGROUND

The merchandise at issue was entered through Chicago between March 13, 1985 and April 2, 1985, and consists of three hematology analyzing machine models, described as microcellcounter CC–180 ("CC–180"), hematology analyzer CC–700 ("CC–700"), hematology analyzer E–5000 ("E–5000"); and one data printer model DP–450 ("DP–450"). Customs classified the machines as "electrical measuring, checking, analyzing or automatically-controlling instruments and apparatus" under item 712.49, TSUS, dutiable at the rate of 6.2% *ad valorem. Plaintiff's Brief* at 16. The printers were also classified under this provision based on the doctrine of "entireties."[1] *Plaintiff's Brief* at 46. The parties have submitted a joint stipulation of facts in lieu of trial detailing the features of the equipment ("Stipulation").

The CC–180, CC–700 and E–5000 are all referred to as "cell counters" or "analyzers" and operate in approximately the same manner. They are principally utilized in the diagnosis of blood disorders. *Plaintiff's Brief* at 17. The machines run a microliter of whole blood through a current of solution which is otherwise free of cells and count the number of individual blood cells which pass. They can calculate the different types of cells and platelets present via electrodes that are attached to a tube which is extended into the blood sample mixed with solution. As each blood cell goes through the solution, it interrupts the current, thus stimulating the electrodes. *Stipulation* at 3–4. Through certain mathematical calculations, the sample results are then translated into standard volumetric units. *Id.* at 4.

Each machine houses microprocessors which utilize formulas to calculate the values necessary to determine certain hematology values, *i.e.*, the number of red blood cells, the number of white blood cells, hemoglobin, hematocrit, mean corpuscular volume, mean corpuscular hemoglobin, and mean corpuscular hemoglobin concentration. The CC–180 also calculates a parameter for the number of blood platelets. The E–5000 calculates those eight parameters, plus an additional seven more, all of which are computed by analyzing the volume and distribution of the displacement created by each cell's passage through the neutral solution. All the machines are designed to assure quality control and are able to

---

[1] The doctrine of entireties dictates that components imported together, which are intended to be used as a unit, and whose individual identities are subordinated to that of the unit, will be dutiable as a unit. *See E.M. Stevens Corp.* v. *United States*, 49 Cust. Ct. 203, Abs. 66971 (1962).

discriminate between relevant and irrelevant information. The E–5000 is also able to discriminate between whole and fragmentary cells, show histograms, and access data without interrupting its current analysis. *Id.* at 3–7.

Although the analyzers can function without a printer, there exists a printing option for each of the machines, such that the researcher may either get the information off the screen, store it in a computer, or have it transcribed onto paper by way of the printer. *Id.* at 5, 8. The printer model at issue can be used in conjunction with various cell counter models. *Plaintiff's Brief* at 49.

DISCUSSION

Classification decisions of Customs are presumed to be correct. 28 U.S.C. § 2639(a)(1) (1982). The burden of proving otherwise rests upon the party challenging the decision. *Id.; Brookside Veneers, Ltd.* v. *United States,* 847 F.2d 786, 787–88 (Fed. Cir. 1988), *cert. denied,* 109 S. Ct. 369 (1988). The Court, however, must consider Customs' determination both independently and in light of plaintiff's alternatives. *Jarvis Clark Co.* v. *United States.,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984). With this in mind, the court now turns to plaintiff's contentions.

*Hematology Analyzers*

The machines, plaintiff asserts, were erroneously classified under item 712.49, TSUS. Following is that provision as it appears in the tariff schedules:

> *Schedule 7, Part 2, Subpart D:*
>
> Electrical measuring, checking, analyzing, or automatically-controlling instruments and apparatus, and parts thereof:
> \* \* \* \* \* \* \*

> 712.49    Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.2% *ad val.*

Instead, plaintiff maintains the equipment is properly categorized under either items 676.15, 676.25, or 678.50, TSUS. These provisions appear as follows:

> *Schedule 6, Part 4, Subpart G:*
>
> Calculating machines; accounting machines, cash registers, postage-franking machines, ticket-issuing machines, and similar machines, all the foregoing incorporating a calculating mechanism:

> 676.15    Accounting, computing, and other data-processing
>           machines  . . . . . . . . . . . . . . . . . . . . . . . . 4.3% *ad val.*
>           \* \* \* \* \* \* \*

> 676.25    Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.3% *ad val.*

> *Schedule 6, Part 4, Subpart H:*

> 678.50    Machines not specially provided for, and parts
>           thereof  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4% *ad val.*

Customs counters that the function of the machines is, as their name suggests, to "analyze" blood and they are therefore properly classified as "electrical measuring, checking, *analyzing* * * * instruments and apparatus." *Defendant's Brief* at 3 (emphasis added).

The common and commercial meanings of a term are generally afforded deference when determining its proper interpretation for tariff purposes. *Toyota Motor Sales (USA), Inc. v. United States,* 7 CIT 178, 182, 585 F. Supp. 649, 653 (1984), *aff'd,* 753 F.2d 1061 (Fed. Cir. 1985); *see Nippon Kogaku (USA), Inc. v. United States,* 69 CCPA 89, 673 F.2d 380 (1982). To determine a term's common meaning, the court may refer to dictionaries and other lexico-graphic authorities. *Mast Indus., Inc. v. United States,* 9 CIT 549 (1985), *aff'd,* 786 F.2d 1144 (Fed. Cir 1986).

"Analysis" is defined as the

> determination, which may or may not involve actual separation, of one or more ingredients of a substance either as to kind or amount; *also:* the tabulated result of such a determination; a statement of the amount or percent of each functional ingredient present in a mixture; a detailed examination of anything complex * * * made in order to understand its nature or to determine its essential features;

*Webster's Third New International Dictionary* 77 (1981) (emphasis in original); and the "determination of the elements of a compound, the proportions of the constituents, the proportion of a special ingredient, or the presence of impurities or adulterations," *Funk & Wagnalls New Standard Dictionary of the English Language* 101 (1942). The breadth of these definitions indicate that the term need not be limited solely, as plaintiff insists, to a pure biochemical analysis, *Plaintiff's Brief* at 32, and *may* indeed refer to sophisticated extrapolations similar to those performed by the analyzers at issue.

Further indication of the proper interpretation of TSUS provisions can be gleaned from the Nomenclature for the Classification of Goods in Customs Tariffs (1955) ("BN"), as it was instrumental in the compilation of the TSUS. *Tariff Classification Study Submitting Report* (1960). It is by now well established that courts may refer to the "BN" where there is "a nexus between the language of the Brussels Provision and that of its counterpart provision in the TSUS." *Phone-Mate, Inc. v. United States,* 12 CIT 575, 580, 690 F. Supp. 1048, 1052 (1988), *aff'd,* 867 F.2d 1404 (Fed. Cir. 1989); *see Toyota Motor Sales, supra.*

Instruments and appliances used in laboratories to test blood are generally classified under Heading 90.25 of the "BN". *Explanatory Notes to "BN"* 1575 (1978). Heading 90.25 of the "BN" states the following:

90.25    Instruments and apparatus for physical or chemical analysis (such as polarimeters, refractometers, spectrometers, gas analysis apparatus); instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension or the like (such as viscometers, porosimeters, expansion meters); instruments and apparatus for measuring or checking quantities of heat, light or sound (such as photometers (including exposure meters), calorimeters); microtomes.

The superior heading of item 711.86, TSUS, (which, when supplemented with an electrical device is incorporated in item 712.49, TSUS) also lists "[p]olarimeters, refractometers, spectrometers, gas analysis apparatus and other instruments or apparatus for physical or chemical analysis" as included within the provision. The similarity in the language of respective provisions is highly probative of the legislative intent that they should coincide. *See Phone-Mate,* 690 F. Supp. at 1052. Similarly, the grouping within the provision analogous to "BN" Heading 90.25 of all analyzing equipment, without specifically excluding laboratory instruments that test blood, denotes congressional legislative intent to include a blood analyzer in item 712.49, TSUS.

Plaintiff alternatively argues that even if the hematology analyzers are classifiable under item 712.49, TSUS, they are nonetheless more specifically provided for in item 676.15. TSUS, or the accompanying provisions. It appears to be plaintiff's contention that the machines are actually data-processing machines "incorporating a calculating mechanism," within the meaning of those provisions. *Plaintiff's Brief* at 35. In support of this, plaintiff notes that calculating machines are "for performing arithmetical operations (such as multiplication) that are usu[ally] more complex than can be done on an adding machine." *Id.* at 21. Hence, since the hematology analyzers perform such functions, they are calculating machines within the meaning of the superior heading to item 676.15, TSUS, and should be classified accordingly.

Here again, the "BN" is probative of which merchandise was intended to be included in the corresponding TSUS provision. *Toyota Motor Sales,* 7 CIT at 185, 585 F. Supp. at 656. The corresponding "BN" heading is 84.52.[2] To be included in this category the machines must employ a calculating device. However, plaintiff's conclusion that these provisions "merely require that a machine perform certain arithmetical functions" in order to be included, is a manifest oversimplification. It bears

---

[2] Heading 84.52, of the "BN" appears as follows:

84.52—CALCULATING MACHINES; ACCOUNTING MACHINES, CASH REGISTERS, POSTAGE-FRANKING MACHINES, TICKET-ISSUING MACHINES AND SIMILAR MACHINES, INCORPORATING A CALCULATING DEVICE.

noting that while a calculating device is the common thread among all the machines listed in the provisions, neither the TSUS nor the "BN" heading purport to encompass within these provisions *all* machines which employ a calculating mechanism.

A "calculating machine" covers, according to the Explanatory Notes to "BN," "a wide range varying from small pocket machines * * * to more complex machines" and includes these "even if they are designed and specialized for a particular purpose." *Explanatory Notes to "BN"* 1343. Consequently, predictors used for anti-aircraft or naval guns, tide predictors that, given certain data, are able to predict future ranges, bearings and tide heights, and other complex machines are included within "BN" Heading 84.52. *Id.* From this, plaintiff concludes that the hematology analyzers are also "complex machines" within the wide range of machines covered under that heading, and by analogy, under item 676.15, TSUS. Plaintiff, however, misunderstands this to mean that all machines which perform calculations for purposes other than the mere generation of numbers are sufficiently similar to those machines listed in "BN" Heading 84.52 to merit classification therein.

While the military and tide predictors, although more complex machines than those listed in the superior heading of item 676.15, TSUS, are classifiable under that provision, they are distinguishable from the hematology analyzers at issue here. Whereas the predictors are somewhat analogous to the calculating function *within* the hematology analyzers inasmuch as both merely process numbers which are provided by an earlier process, they are nonetheless only complex calculating machines — not analyzers incorporating a calculating function.

This concept is well established by *Burroughs Corp.* v. *United States,* 11 CIT 291, 664 F. Supp. 507 (1987), *aff'd,* 845 F.2d 321 (Fed. Cir. 1988), *cert. denied, sub nom. Unisys Corp.* v. *United States,* 109 S. Ct. 140 (1988). In *Burroughs,* the plaintiff asserted that a certain machine was not a calculating device or data processor under item 676.15, TSUS. The court held that an electronic calculator, which could compute loans, future-values and other banking transactions, fell within item 676.15, TSUS, even though "the preprogramming enables a user to perform mathematical tasks far beyond those of machines designed specifically for multiplication and division." *Id.* at 296, 664 F. Supp. at 512. The *Burroughs* court recognized that the calculations, albeit complex, were the ultimate function of the machines. Thus, in order to be classified under item 676.15, TSUS, the hematology analyzers must not simply employ a calculating device, but must also be similar in function to the machines specifically listed.

Conversely, the calculations performed by the data processing feature of the hematology analyzers are merely incident to the machines' main function of analysis. The analyzers are not "for" performing arithmetical functions merely because they perform such functions in the process of accomplishing a broader goal. Moreover, to find that the machines are merely data processors "employing a calculating mechanism" would not

only disregard their ultimate purpose, but would leave a major function of the analyzers unaccounted for.

Examination of the development of items 712.49 and 676.15, TSUS, offers further support for the grouping of the hematology analyzers within item 712.49, TSUS. Laboratory machines were once grouped together with calculating machines under paragraph 360 of the Tariff Act of 1922. 3 *Summaries of Tariff Information* 117–18 (1948). Under the Tariff Act of 1930, however, laboratory machines were kept in paragraph 360, which included pyrometers and moisture testers in one subsection, as well as other scientific and laboratory instruments in another, while calculating machines were separated into paragraph 353. Tariff Act of 1930, Pub. L. No. 361, 71st Cong. 2d Sess. (1930).

The present TSUS also separates laboratory machines into two subparts — those with an essential electrical element (item 712) and those without (item 711). Calculating machines are placed within an entirely different category — that of office machines (item 676). Tariff Schedules of the United States (1986). Headnote 2(a) of Subpart G specifically states that "the term *'office machines'* refers to machines which are used in offices, shops, factories, workshops, schools, depots, hotels, and elsewhere for doing work concerning the writing, recording, sorting, filing, mailing of correspondence, records, accounts, forms, etc." This provides further illustration of a clear legislative intent to categorize the machinery in accordance with their general function.

The Court finds further support for Customs' determination in *Burrows Equip. Co.* v. *United States,* 62 Cust. Ct. 681, C.D. 3848, 300 F. Supp. 455 (1969), where the court was faced with a challenge to the government's classification of a vitascope under item 711.88, TSUS.[3] The vitascope, described by the court as "an instrument for determining the germinating capacity of seeds," involves a process that relies upon a chemical reaction which causes those seed germs capable of germinating to be dyed red. *Id.* at 683, 300 F. Supp. at 456. There, the plaintiff asserted that the vitascope merely stained the seed, without performing any chemical analysis.

The *Burrows* court concluded, however, that

> an instrument or apparatus *is included* within the common meaning of the term 'chemical analysis' if it determines one or more ingredients of a substance either as to kind or amount; or if it performs a detailed examination of a complex chemical substance for the purpose of enabling one to understand its nature or to determine an essential feature; or if it determines what elements are present in a chemical substance.

*Id.* at 686, 300 F. Supp. at 458 (emphasis in original). The vitascope was found to fall within the court's common meaning definition of "chemical analysis."

---

[3] Item 711.88, TSUS, is an "other" provision which comes under the same superior heading as item 712.49, TSUS.

As in *Burrows,* plaintiff herein suggests that the hematology analyzers do not perform the type of analysis encompassed by the traditional definition of "analysis." Adopting the definitional guidelines established in *Burrows,* however, this Court finds that the function of the analyzers fits squarely within them.

Plaintiff's further attempt to shield the machines from classification as laboratory-type analyzers on the basis of their advanced technological status is equally unfounded. Clearly, although this particular type of hematology analyzer did not exist when the TSUS was created, its nature and function place it well within the scope of item 712.49, TSUS. *Texas Instruments Inc.* v. *United States,* 1 CIT 236, 244, 518 F. Supp. 1341, 1346 (1981) (where the court held that tariff schedules "are written for the future as well as for present application and may embrace merchandise unknown at the time of their enactment" as long as such merchandise possesses an essential resemblance to the characteristics as described by the applicable tariff provision), *aff'd,* 69 CCPA 136, 673 F.2d 1375 (1982).

Similarly, the analyzers cannot realistically be called data-processors because although, as plaintiff notes, the data-processing function of the hematology analyzers is essential to the analysis of blood, it is nonetheless only a component of a machine whose overall purpose is to analyze. The machines' functions are to break blood up into its parts, quantify each, and determine the various qualities. Since they determine "one or more ingredients of a substance either as to kind or amount," *Burrows* at 685, 300 F. Supp. at 458, this Court finds that the imported machines "analyze" within the meaning of items 711.86 and 712.49, TSUS. As such, Customs' classification of the hematology analyzers under item 712.49, TSUS, was appropriate.

*Printers:*

In addition, plaintiff contests Customs' classification of the data-printers also under item 712.49, TSUS, based on the "entireties" doctrine. In support of this claim, plaintiff notes that the printers are an optional component, not necessary for the operation of the machines. *Stipulation* at 8.

Articles are dutiable in the condition in which they are imported. *Donalds Ltd., Inc.* v. *United States,* 32 Cust Ct. 310, 314, C.D. 1619 (1954). Moreover, it is beyond dispute that the doctrine of "entireties" is inapplicable where the imported components retain their individual identities. *Id.* at 315; Sturm, *Customs Law & Administration,* § 54.11. Examination of the stipulated facts as well as the advertising literature confirms that the analyzers function independently, although they are adaptable to use with a variety of printer models. *See E–5000 Advertising Manual* at 17. Moreover, that only fifteen sets of printers were imported in an entry of approximately forty analyzers further bolsters plaintiff's claim. *See Demuth Steel Prod. Co.* v. *United States,* 12 CIT 480, 688 F. Supp 632 (1988). Finally, there is no indication that the

printers are considered an integral part of the hematology analyzers. *Donalds,* at 314.

Hence, plaintiff has overcome the presumption of correctness attaching to Customs' classification. 28 U.S.C. § 2639(a)(1). The data-printers are thus properly classified under item 676.30, TSUS, as "office machines."

CONCLUSION

In view of the foregoing, the Court hereby concludes that since the analyzers perform a detailed examination of the blood, their function fits plainly within the meaning of "analysis" as applicable under item 712.49, TSUS. Customs' classification of the hematology analyzers as "checking, analyzing, or * * * instruments" was therefore proper, and is affirmed. The presumption of correctness attaching to Customs' classification of the "DP–450" data-printers has been overcome by plaintiff. They are provided for under item 676.30, TSUS, as "office machines" and are to be reliquidated as such.